Drayton *v.* Drayton.

# CHARLOTTE AUGUSTA DRAYTON

*v.*

## JAMES COLEMAN DRAYTON.

1. Desertion for which, under the statute of this state, divorce *a vinculo matrimonii* may be had, is not justified by proof of conduct on the part of the deserted party, short of that which will entitle the deserter to a decree for divorce or judicial separation.

2. If a suit for divorce for adultery be brought promptly after separation of the accuser from the accused, and in good faith, and be prosecuted with diligence, in a subsequent suit for desertion by the accused, the time consumed by it will not be computed as part of the statutory period necessary to the desertion which will authorize a decree for divorce.

3. It is not collusion for both husband and wife to wish their matrimonial relation dissolved. Collusion does not exist without agreement or understanding between the parties to the suit.

---

On petition for divorce for desertion, answer and proofs.

*Mr. Richard V. Lindabury* (with whom was *Mr. Herbert A. Shipman*, of the New York bar), for the petitioner.

*Mr. Alvah A. Clark*, for the respondent.

THE CHANCELLOR.

The petitioner seeks a divorce *a vinculo matrimonii*, because of her husband's willful, continued and obstinate desertion of her for upwards of two years prior to the filing of her petition.

The proofs disclose that she and the defendant were married in October, 1879, in the city of New York, and thereafter resided in that city until the year 1886, when they removed to a dwelling which the defendant had erected in Bernards township, in Somerset county, in which county they have retained their residence hitherto.

One evening in October, 1891, upon the petitioner's return from New York city, her husband, in violent temper, accused her of infidelity to her marriage vows through criminal intimacy

Drayton v. Drayton.

with one B., a neighbor. Distressed by the indignity of the accusation, the next morning the petitioner went to her father's house, at Rhinebeck-on-the-Hudson, and remained away from her husband until in November, through the intervention of her family, he and she unwillingly became nominally reunited, and, with their four children, went to England. There they secured furnished rooms in London and a house at Wimbledon, at which places—sometimes at one and sometimes at the other—they lived; but the defendant, adhering to the conviction that his wife had been unfaithful to him, refused to occupy the same room with her or to accompany her where she went, either in the pursuit of pleasure, of business or in the performance of social duties, and would not remain with her when, for any reason, they happened to be left alone with each other. She testifies that his conduct made her life unhappy and miserable; that she had no intimate friends in London to whom she could confide her troubles; that she needed some one with whom she might talk and who would secure for her legal advice, for she made up her mind that it was necessary to her happiness that she should have a legal separation from her husband; that, consequently, she telegraphed to America to B., to come to London; that, at that time, her father was in France; but, as he had evinced a strong desire to avoid public scandal through her domestic infelicity, she thought he would disapprove of a separation and refuse to aid her; that B. promptly answered her summons, and, upon reaching his hotel in London, telegraphed her, announcing his arrival, and she immediately visited him at his hotel, and there told him of her distress and of her desire for legal advice; that B. was acquainted with an American lawyer who was then in London, and later arranged for an interview between her and the lawyer, and at his (B.'s) hotel, in the day, at noon; that she went to the hotel at the appointed time, and there met B., with whom, because of the lawyer's delay, she was obliged to wait; that they waited in a public parlor for a time, and then B. proposed that they should have lunch, and upon her assenting and the lunch being prepared, they went from the parlor to another room, in which they were attended by a waiter; that while they

Drayton v. Drayton.

were at lunch, her husband entered with two men, who evidently were detectives or were acting in that capacity, and after calling upon them to identify her and B., with them departed; that later the lawyer came, and after conference with him, she went to the rooms which she and her husband had retained in London; that she did not see her husband again, but it was arranged between her lawyer and his lawyer that she should go to Wimbledon, where her children were, and bid them good-bye; that after staying at Wimbledon two or three days with her children—her husband then being in France—she went to Paris for the purpose of seeing her father, but, for some undisclosed reason, failed to call upon him, and returned to London, and from that place wrote to him; that thereafter, by her father's direction, she returned to Paris and saw him, and was persuaded by him, for the sake of her children and herself, to seek a reconciliation with her husband, and that thereupon she exerted every effort to bring about such a reconciliation and to induce her husband to permit her to return to him.

The proofs abundantly satisfy me that these efforts were made in good faith, and that every overture on her part was rejected by the defendant, who steadfastly insisted that she had been unfaithful to him and her marriage vows.

The precise date of the separation of the husband from his wife is not in proof, but it is clear that it was prior to the 1st of March, 1892, so that when the petition in this suit was filed more than two years had elapsed.

The attitude of the defendant satisfies me that his separation from his wife has been willful, continued and obstinate. The question is, was it justifiable?

The records of this court show that, on the 27th of June, 1894, Mr. Drayton filed his bill for an absolute divorce from his wife upon allegations of adultery upon her part with B., and that in October of the same year Mrs. Drayton answered that bill, denying the truth of its allegations, and that from that time hitherto the defendant has not produced his proofs and brought his cause to hearing. By his answer in the present suit he does not reiterate his charges against his wife in defence to her action,

but contents himself with a denial that his separation from her has been willful, continued and obstinate, averring that his wife was "fully advised of his movements and his reasons therefor."

After the petitioner's proofs had been closed, the defendant declared that he would not offer any evidence upon his part.

It clearly appears that the defendant entertained grave suspicions which, I think, convinced him that his wife had been disloyal to her marriage vows and duty, and, when it is considered that the wife, rendered unhappy by her husband's suspicion of her adultery with B., selecting that person in preference to her father and all other kindred and friends, as her supporter in the emergency that confronted her, and summoned him by telegraph from America to England, and that he promptly obeyed that summons, and at his hotel, to which she went, counseled with her in dealing with her husband with a view to a separation from him, it is impossible to escape the conviction that the husband's grave suspicions were not destitute of foundation, in questionable circumstances at least. But I fail to find, and my attention has not been directed to any adjudication which holds that, under a statute similar to ours, a husband may, with impunity, be guilty of desertion of his wife, merely because he believes her, even under gravely-suspicious circumstances, to have been guilty of adultery.

In a Massachusetts case, strong *prima facie* evidence of a husband's adultery appears to have been held sufficient to defeat his application for divorce for the wife's desertion, but there the statute provided that the desertion was to be without fault on his part. *Clapp* v. *Clapp, 97 Mass. 531.* The generally-accepted, and, I think, the true, doctrine is, that continued desertion, as contemplated by such a statute as ours, is justified only when it is shown by clear and satisfactory proof that the deserting party has been so offended against as to authorize, at his instance, a decree for divorce or judicial separation. *Black* v. *Black, 3 Stew. Eq. 221; Moores* v. *Moores, 1 C. E. Gr. 275; Weigand* v. *Weigand, 14 Stew. Eq. 209; 1 Bish. Mar., D. & S. §§ 1217, 1742; Browne Div. 152, 159; Stew. Mar. & D. § 257.*

In *Grove's Appeal, 37 Pa. 443, 447,* Judge Strong said: "We

have adopted the same principle which rules in the English ecclesiastical courts. In that country, where cohabitation is suspended by either the husband or wife, of his or her own motion, without a sufficient reason, a suit for a restitution of conjugal rights may be maintained by the injured party. Nothing amounts to a bar against such a suit, except such facts as would entitle the defendant to a divorce. * * * The interests of society, the happiness of the parties and the welfare of families demand such a rule. Separation is not to be tolerated for light causes." See, also, *Turton* v. *Turton, 3 Hagg. Ec. 338, 350; Sopwith* v. *Sopwith, 2 Swab. & T. 160, 164; 30 L. J. (P. M. & A.) 131.*

If, then, the defendant would rely upon his wife's adultery as a defence against her charge of desertion, he must prove it.

There is no evidence that it was the intention of the defendant, at the time he left the petitioner, to institute a suit for divorce on the ground of her adultery. He did, in fact, commence such a suit in June, 1894, a time so remote from the commencement of the separation that more than the period prescribed by law, within which desertion must continue to constitute a cause for divorce, had intervened and thereby a cause for divorce had then become available to her, and even after the lapse of that time his suit was not prosecuted with diligence.

If his suit had been brought promptly and in good faith after the separation, the time consumed by it, during which the law does not require him to cohabit with his wife, would not be computed as part of the statutory period necessary to the desertion which will authorize a decree for divorce (*1 Bish. Mar., D. & S. § 1757*), but its mere institution after such statutory period of desertion was complete (it matters not whether in good faith or otherwise) will not avail as a defence to a suit by the wife for divorce on the ground of desertion. *1 Bish. Mar., D. & S. § 1758.* It was his duty to act expeditiously, so that his wife should not remain longer than necessity required, if guilty, unconvicted, and if innocent, under the shadow of a scandalous and disgraceful charge.

The remaining consideration which suggests itself is whether the present suit is collusive.

Drayton v. Drayton.

I do not find enough in the case to warrant me in so holding. The apparent confidence with which the defendant originally made the accusations against his wife, coupled with his surprising failure, by way of defence, to efficiently reaffirm his charges in his answer, his present submission of the case upon the testimony produced by the petitioner alone, and the failure of the petitioner to demand the custody of her children, engender a strong apprehension of the existence of collusion in this suit which has caused me to closely scrutinize the testimony. I find that, after the announcement that the defendant would not offer proofs, the counsel for the petitioner, evidently anticipating the question which the defendant's determination would arouse in my mind, recalled the petitioner to the witness-stand, where, in explicit terms, she stated that her suit was not brought and the defendant's defence on the ground of adultery was not withheld, in pursuance of any agreement or collusion between her and her husband, or between any others acting in behalf of them or either of them, and testified that it was her expectation, until her husband's answer was filed, that he would defend the suit on the ground of her adultery, and that one object of her suit was to force that issue to immediate trial, and then denied that she had been unfaithful to her marriage obligation.

After the case was submitted to me, out of abundant caution against the deception of a collusive suit, I caused the petitioner to be again and further examined as follows, upon interrogatories under commission sent to England, where she was then sojourning:

"*1.* Was there any arrangement, agreement or understanding between you and your husband, or between any persons acting in behalf of you and your husband or either of you, or in behalf of your father's family or any member or members of it, in pursuance of which your suit was commenced or prosecuted, or in pursuance of which your husband refrained from defending against your suit on the ground of your alleged adultery'?

"*Answer.* There was not.

"*2.* Have you had any intimation of the existence of any such arrangement or agreement? If yes, state fully what that intimation was.

"*Answer.* I have not.

"*3.* Read over with care the testimony which you gave in this cause, on the 27th of May, 1895, and state whether you are aware of any suppression or

evasion, either in or by the questions put or in or by the answers given, or by the omission of questions or answers, whereby some agreement, arrangement. or understanding of the character indicated by the first above question is not revealed to the court? If yes, state what is suppressed or evaded.

"*Answer.* I have read over my testimony, given on the 27th of May, 1895, and answer that I am not aware of any suppression or evasion, either in or by the questions put, or in or by the answers given, or by reason of the omission of questions or answers, whereby some agreement, arrangement or under-standing of the character indicated by the first above question is not revealed to the court.

"*4.* Why do you not ask for the custody of your children or the custody of one or more of them?

"*Answer.* A proceeding was commenced in the surrogate's court of the county of New York, on the 12th of June, 1894, wherein I am the petitioner, and in which I ask to be appointed guardian of my two youngest children, and to have such an allowance as the surrogate should determine to be a proper one for their support, made payable to me as such guardian. This proceeding has been adjourned from time to time, pending the final accounting of the trustees under my father's will, which will be had in March, 1896. My father left a fund of $850,000 in the hands of New York trustees, for the support of my children. It was for an allowance out of that fund that I applied to the sur-rogate of New York, but I was influenced quite as much by this: I expected that my suit would be defended on the ground of infidelity. My lawyers told me that even if I obtained a divorce on the ground of desertion, I might not be awarded the custody of my children, as other considerations would control that question. They also told me that the question of who should have the control of the children could be raised after the divorce proceedings were ended, as well as in such proceedings. I thought it best, on this account, inde-pendent of the New York proceedings, to tender in my divorce suit the single question of my guilt or innocence of the charges my husband was making. against me, and leave the question of custody of our children to be determined afterwards.

"*5.* Have you in any manner, directly or indirectly, assented to your hus-band's having and retaining the custody of your children? If so, state with full particulars what that assent was and the facts and circumstances which led to it.

"*Answer.* I have not."

The reason why the defendant did not urge the defence of adultery is not apparent. It may be that he was satisfied that he could not prove it, or it may possibly be that, in view of the probable success of her suit and the attainment of an absolute divorce in it, if he did not successfully defend on the ground of her adultery, to avoid the scandal which the proof of such a defence would occasion, he denied the desertion merely. It is not

collusion for both husband and wife to wish their matrimonial relation dissolved. *2 Bish. Mar., D. & S.* § *256.* And it may be that the petitioner considered that, as her husband desired a divorce, her failure to demand the custody of her children might induce him to withhold the defence which she anticipated and avoid for both of them an acrimonious and mortifying litigation, whatever might be its result. Action upon such consideration would not be collusion. Collusion does not exist without an agreement or understanding between the parties to the suit.

It is noted that, in his answer, after denying the desertion charged, the defendant adds the significant language, that his wife " was fully advised of his movements and his reasons therefor," which appears to me to be the covert reiteration of his charges against his wife, sufficient to mortify and insult her, without putting him to the necessity of proving his charges, and tends to show that when he answered, at least, he did not act collusively with her, for in that event it is not probable that he would have made this useless and unnecessary averment.

I do not find anything in the case to justify me in refusing the decree sought.

The divorce will be granted.