H. ROSE NAPPE, PLAINTIFF-RESPONDENT, v. MORITZ NAPPE, DEFENDANT-APPELLANT.

Argued November 28, 1955—Decided January 16, 1956.

338

Mr. *Theodore D. Parsons* argued the cause for the defendant-appellant (*Messrs. Parsons, Labrecque, Canzona & Combs,* attorneys; Mr. *William R. Blair, Jr.,* on the brief).

Mr. *Benjamin M. Ratner* argued the cause for the plaintiff-respondent.

The opinion of the court was delivered by

OLIPHANT, J.   This is an appeal from a judgment of the Superior Court, Chancery Division, setting aside and declaring null and void a decree of divorce granted on June 30, 1952 to the appellant on his counterclaim in the Second Judicial District Court of the State of Nevada, in and for the County of Washoe.   The judgment below contains other provisions which we must consider on this appeal but their resolution largely depends on the validity of the Nevada decree.

This appeal was certified here on our own motion.   *R. R.* 1:10–1(*a*).

The premise and rationale of the lower court in setting aside the decree of divorce granted to the appellant in the

State of Nevada is that it was fraudulently obtained and therefore not entitled to full faith and credit in this State under the doctrine of our decision in *Staedler v. Staedler*, 6 *N. J.* 380 (1951). We are not in accord with the conclusion of the trial court that the *Staedler* case is controlling here.

This is a bitterly contested case and the record is disjointed and prolix. But a careful reading of the record leads us to the conclusion that the action of the respondent in filing for a divorce in Nevada was voluntarily taken after she had the advice of independent counsel of her own choosing, both in New Jersey and in Nevada. It is true that both the parties immediately returned to the State of New Jersey upon the entry of the decree in Nevada and that both went to Nevada solely for the purpose of obtaining a divorce. That this latter fact is offensive to the public policy of this State is clear both under our statute and our decisions, *N. J. S.* 2A:34–22; *Peff v. Peff*, 2 *N. J.* 513, 522, 523 (1949); *Shepherd v. Ward*, 5 *N. J.* 92, 103 (1950); *Judkins v. Judkins*, 22 *N. J. Super.* 516, 523 (*Ch.* 1952). But on the jurisdictional facts as shown by the record in this case, under the decisions of the United States Supreme Court we are not permitted to challenge their validity except under the doctrine of the second *Williams* case, *Williams v. State of North Carolina*, 325 *U. S.* 226, 65 *S. Ct.* 1092, 89 *L. Ed.* 1577 (1945), which is only applicable to cases where the jurisdiction of the Nevada court is based upon an order of publication and substituted service and the decree is entered in an *ex parte* proceeding.

The difficulty arises out of trying to apply the legal fiction of domicile, and it is a fiction, as the basis of jurisdiction of the subject matter and person in this type of case. We must confess that we share the difficulty of most persons in comprehending how a parent with a spouse and minor children is as free to establish a domicile away from the home shared with the spouse and children, as the wild goose of fable and story whose habitation is where it momentarily alights in flight. See *Judkins v. Judkins, supra;* "Haddock Re-

Visited," 39 *Harv. L. Rev.* 417. We likewise have difficulty in reconciling the cases on divorce under the Full Faith and Credit Clause with the cases on workmen's compensation under the same clause where the question of conflict in public policy in the statutes of two sovereign states presently seems to be controlling over other legal considerations in such fully litigated cases. *Cf. Buccheri v. Montgomery Ward Co.*, 19 *N. J.* 594 (1955).

But in the situation here presented under the cases above cited our public policy must bow to the constitutional principles set forth in those cases by the United States Supreme Court.

It appears from the record in this case, and it seems to be conceded by both sides, that between the dates of May 12, 1952 and June 30, 1952 the respondent had established a *bona fide* residence in the State of Nevada sufficient under the Nevada statute to sustain her suit for divorce from her husband on the grounds of extreme cruelty. In her complaint she alleged she was a resident of the State of Nevada and she had taken up her home there with an intent to remain permanently. The husband filed an answer denying knowledge or information sufficient to form a belief as to the wife's allegation of residence and filed a cross-complaint for divorce on the ground of extreme cruelty setting forth, *inter alia*, a separation agreement entered into in Reno, Nevada, on June 30, 1952. A trial was had on the complaint and cross-complaint before the court sitting without a jury. The respondent testified as to her residence but was not cross-examined with respect thereto, and her residence was corroborated by the owner of the motel in which she resided. The defendant likewise testified and the court awarded him a divorce on the ground of extreme cruelty and incorporated in its decree the provisions of the separation agreement. The respondent was represented by counsel of her own choice and she had the opportunity to raise the domicile question if she so desired, but she did not and we cannot be impressed by her protestation that she was foreclosed from fully contesting the case.

The United States Supreme Court has held that full faith and credit must be accorded a decree divorce of a sister sovereign state if a defendant-spouse appeared in the divorce proceedings and contested the issues; *Sherrer v. Sherrer*, 334 *U. S.* 343, 68 *S. Ct.* 1087, 1097, 92 *L. Ed.* 1429 (1948); or appeared and admitted the domicile, *Coe v. Coe*, 334 *U. S.* 378, 68 *S. Ct.* 1094, 92 *L. Ed.* 1451 (1948); or was personally served with process in the state which awarded the decree, *Johnson v. Muelberger*, 340 *U. S.* 581, 71 *S. Ct.* 474, 95 *L. Ed.* 552 (1951); and if the spouse either admits or contests the issue of plaintiff's domicile or is personally served in the divorce state he is barred from attacking the decree in a sister state, *Cook v. Cook*, 342 *U. S.* 126, 72 *S. Ct.* 157, 96 *L. Ed.* 146 (1951).

In *Isserman v. Isserman*, 11 *N. J.* 106 (1952), we held that a decree of the Nevada court was entitled to full faith and credit in this State where the wife through her independently selected counsel, recommended by her New Jersey counsel, appeared in the divorce proceeding instituted by her husband, pleaded to the complaint, filed a cross-complaint and contested the jurisdictional question of the residence of her husband.

The case here presents even a stronger situation under the holdings of these decisions in that it was the respondent-wife who instituted the proceedings in Nevada based upon her residence there which met the statutory jurisdictional requirement of the Nevada court and the case proceeded to final judgment with both sides represented by independent counsel with an opportunity to test the jurisdictional question. Under these principles the final decree of divorce entered in the Second Judicial District Court for the State of Nevada, in and for the County of Washoe, on June 30, 1952, granting a divorce to the defendant-husband on his counterclaim on the ground of extreme cruelty is entitled to full faith and credit in this State insofar as it dissolves the marriage relation of the appellant and respondent here, *Robison v. Robison*, 9 *N. J.* 288, 291 (1952); *Isserman v. Isserman, supra; Woodhouse v. Woodhouse*, 11 *N. J.* 225,

228 (1953); *Stultz v. Stultz*, 15 *N. J.* 315, 319 (1954); *Whitehead v. Villapiano*, 16 *N. J. Super.* 415 (*App. Div.* 1951), unless it can be said that the situation here presented comes within the rule of *Staedler v. Staedler, supra.*

In *Isserman v. Isserman, supra,* we carefully distinguished the *Staedler* case, but we find it necessary again to point out that the *Staedler* case was based upon specific and particular facts peculiar to it and on those facts we found and stated that every step taken by the wife in the Florida proceeding was under the direct control of her husband and counsel retained by him, and made it clear that it was not a true adversary proceeding to which the rule of *Sherrer v. Sherrer, supra,* and *Coe v. Coe, supra,* and other analogous cases were applicable.

We now specifically point out two important facts in the *Staedler* case that are apparently casually passed over in the application of the principle of that case. The proofs in that case showed clearly and undisputedly, and this court so found, that the husband was not a resident in Florida on September 18, 1947, and that he did not reside in Florida for 90 days next preceding the institution of the action in that state, which was a requisite jurisdictional requirement under the statutes of Florida, and that the plan conceived by him and his counsel in which the wife participated had for its purpose the intent to defraud the Florida court with respect to this fundamental requisite of jurisdiction. Further, the divorce in Florida was instituted pursuant to an agreement which, *inter alia,* provided and required that the wife would enter "any appearance required in the divorce proceeding" and that should she "oppose said divorce proceeding the said trust shall become inoperative and the monies deposited thereunder shall be returned to the party of the first part."

We came to the conclusion such an agreement was an integral part of the fraud perpetrated on the courts of Florida since it was patently a bargain to bring a divorce suit in which no defense was to be entered and was *per se* unlawful. Such a situation is clearly distinguishable from the

one before the court here, where the respondent-wife established a residence in the State of Nevada sufficient to meet the jurisdictional requirement of the statute of that state on divorce, and there is nothing in the written agreement incorporated into the final decree that prevented her of and on her own volition at any time to contest her husband's counterclaim in the State of Nevada or to withdraw her own complaint and withdraw from the suit. These facts bring this case within the decision in *Isserman v. Isserman, supra,* rather than *Staedler v. Staedler, supra.*

The respondent insisted below and insists here that the entire proceeding in Nevada was a result of a fraudulent scheme in which she and her husband and counsel in New Jersey, independently chosen by each, conspired to commit a fraud upon the Nevada court. The argument is premised in part on the fact that her New Jersey counsel recommended Judge Souter in Nevada as a lawyer who could represent her when she went to Nevada to institute the suit and that subsequently the New Jersey lawyer was consulted and did advise with respect to the property arrangements being entered into by the separation agreement executed in Nevada on June 30, 1952, which is incorporated as part of the Nevada decree.

We have carefully examined the conflicting testimony with respect to the negotiations, advice, and the part played by the New Jersey attorney in representing the respondent's interest both before and after the entry of the Nevada decree. He was dealing with an extremely difficult and explosive situation and it appears he was at all times attempting to protect the respondent's interest to the very best of his ability. He carefully explained and advised as to the law of New Jersey with respect to such cause of action for divorce as the respondent had, particularly as to the *quantum* of proof required to prove a case on the ground of adultery. He attempted to work out an agreement of separation with adequate security to guarantee that it could be enforced, but this effort came to nothing.

On the possibility that the respondent contemplated instituting an action in Nevada for a divorce on a ground that was not recognized in this State, he had the duty to advise her as to her right to institute such a suit subject to the controlling decisions of the United States Supreme Court together with their limitations and the general uncertainty of the law in that field and the dangers incident to such a step if she took it. All of which has now come home to roost insofar as the respondent here is concerned. This he did and he made it equally clear that if the respondent did go to Nevada she would be going on her own responsibility and would be bound by any judgment entered there.

Once an attorney has done this and leaves it to the voluntary decision of the client as to whether such a proceeding is to be instituted by the client in a foreign jurisdiction, counsel may suggest the name of a reputable attorney in such other state so that his client may be advised by such lawyer who has the competence to give the necessary legal advice with reference to the contemplated action. We deem it advisable to state this warning, however, that at that point the attorney should terminate the relationship of attorney and client, present his bill and be paid for his services. Any participation thereafter in the divorce proceeding in the foreign state may form a foundation of a charge that the New Jersey attorney is *particeps criminis* when subsequently a fraud is perpetrated upon the courts of the foreign state and thus bring the rule of the *Staedler* case into play.

As we have said, the filing of the suit in Nevada was the voluntary act of the respondent and the proofs do not sustain the charge that the attorney advised the respondent to seek the remedy in Nevada. We have merely the uncorroborated statements of the respondent.

There is testimony that during the negotiations here in New Jersey the respondent took the position she merely wanted a separation and not a divorce on the ground of adultery, and she had a reluctance to go forward with a suit for divorce on the ground of adultery in this State because of the notoriety and unfavorable publicity it might bring

down upon her and her children. This is a valid reason and such a choice was hers. *Cf. Drayton v. Drayton,* 54 *N. J. Eq.* 298, 304 (*Ch.* 1896). She must have been aware at the time she went to Nevada that she had proof sufficient to support a cause of action for adultery in this State if she chose to institute one. The appellant very brazenly testified below he occupied an apartment in Red Bank, New Jersey, with the third woman and one of his sons over a considerable period of time. We cannot assume that respondent was unaware of these facts, but rather we must assume that she knew where this son was since he was living separate and apart from her and her other boy. All this is indicative that her decision to institute the action in Nevada was hers and hers alone, made voluntarily for reasons that were sufficient for her purposes and not a part of any scheme concocted by her New Jersey attorney to aid her in her attempt to commit a fraud upon the courts of Nevada.

The fraud charged by her here goes to the essence of the divorce proceeding and not to the agreement of separation entered into in Nevada on June 30, 1952. Her New Jersey attorney on request undertook to represent the respondent by advising her and her Nevada lawyer as to the legal effect of such agreement in New Jersey and as to the method and means by which it could be enforced. We feel that in so doing he was discharging a duty in giving his client representation as to her rights and liabilities under this agreement on which he or any other New Jersey lawyer was and could give competent advice which was not available to her in Nevada. This latter feature does not take this case out of the rule of *Isserman v. Isserman, supra,* and bring the rule of *Staedler v. Staedler, supra,* into play.

The final fact relied on by the respondent is that her Nevada lawyer was paid by funds forwarded to her from New Jersey by her husband. The mechanics of this transaction are not clear in the record but we see nothing that offends the public policy of this State simply because a lawyer of her independent choosing is remunerated by her husband. Such orders are entered each day as a matter of routine in divorce

proceedings in this State, and she was legally entitled to have her husband pay this counsel fee.

This leads to the conclusion that the final decree of divorce entered in Nevada on June 30, 1952 is entitled to full faith and credit in this State and that the trial court was in error in setting it aside.

■■ We turn now to the other provisions of the judgment entered below. The trial court ordered the appellant to pay maintenance in the sum of $100 a week to the wife in addition to the sum of $25 per week for each of the infant children of the marriage. Since we have concluded that the Nevada decree is valid and entitled to full faith and credit, the court below was without jurisdiction to award maintenance to a wife who has been adjudged guilty of a marital offense by a court of competent jurisdiction. Maintenance is based upon the duty of support arising out of a subsisting marriage. *O'Loughlin v. O'Loughlin,* 12 *N. J.* 222, 231 (1953).

■■ The two infant children are not bound by the provisions of the Nevada decree relating to their support since they were not represented in the proceeding. *Isserman v. Isserman, supra,* 11 *N. J.,* at *page* 115. The cause is therefore remanded with respect to the infants for the trial court to determine on proper proof whether the provisions for the support of the children incorporated in the Nevada decree are adequate and proper under all the circumstances or whether further provision should be made for them. The provisions of the agreement incorporated in the Nevada decree are enforceable in this State under the principles stated in *O'Loughlin v. O'Loughlin,* 6 *N. J.* 170 (1951); *O'Loughlin v. O'Loughlin,* 12 *N. J.* 222 (1953); *Woodhouse v. Woodhouse,* 17 *N. J.* 409, 417 (1955); *Whitehead v. Villapiano, supra.*

■ The trial court further found and adjudged that the appellant was indebted to the respondent in the sum of $18,750, representing a one-half interest in the proceeds of the sale of certain premises in Colts Neck, New Jersey, which was held by the appellant and respondent as a tenancy

by the entirety and conveyed by a deed signed by both to third parties on March 29, 1951. The effect of this conveyance signed by both parties was to terminate the estate by the entirety and change their holdings to that of tenants in common in the equity in the property. The closing statement is a bit ambiguous and obscure, and the oral testimony by which the items were attempted to be explained was conflicting, with the result that there is a difference of some $6,506.16 in the figures arrived at by both sides as of the time of closing. The testimony further is that the money proceeds were deposited in a joint account in a Farmingdale bank. That account is not before the court, but we must point out that what the court is called upon to adjudge and decree is the interest the wife had in the proceeds at the time this suit was filed. The cause is remanded so that this can be determined in an accounting based on the wife's right as a tenant in common and the establishment of any debits or credits in that sum which may have arisen since that time. Obviously the wife is entitled to a credit for any withdrawals made by her from the joint account which were required to provide support for herself and her children in accordance with her station in life if such had not been provided in the interim by the husband.

The order further adjudged and decreed that the wife was a full partner in Nappe-Smith Manufacturing Company and the Farmingdale Realty Company and required the appellant to execute deeds of conveyance to be made of any and all real estate owned by both corporations conveying said property to the appellant and respondent as equal partners.

This part of the order seems to be without any foundation. The only interest that the wife ever had was one share of qualifying stock in one of the companies and two in the other, the certificates for which were never delivered to her, and this she says was in consideration of her husband's promise to give her a half interest in the business. But her contention in this regard goes without corroboration; it is on its face so vague and indefinite as to offer no basis for a finding of a legal obligation. If a partnership in a corpora-

tion could be established on such shadowy testimony it could lead to untold mischief in the law of corporations. While each case is different the fundamental principles applicable were discussed in *Farris v. Farris Engineering Corp.*, 7 *N. J.* 487, 498 *et seq.* (1951); 12 *Fletcher Corporations, sec.* 5683 *et seq.* We find the testimony as to equal access to a safe deposit box or to certain indefinite joint bank accounts to be totally insufficient to establish a perfected *inter vivos* gift of corporate stock or interests.

The trial court below awarded a counsel fee of $6,600 to the respondent's attorney. This was in addition to a counsel fee of $1,000 allowed on a *pendente lite* application. We have carefully considered this and have come to the conclusion that at this stage of the proceedings a counsel fee of $3,000 in addition to the *pendente lite* allowance is adequate. *Isserman v. Isserman, supra,* 11 *N. J.*, at *page* 116. Any further allowance must wait the final disposition of the cause.

Finally, as to the United States Saving Bonds which are deposited with the First National Bank of Farmingdale, which were deposited in a proceeding in the Monmouth County Court, Probate Division, for the appointment of a guardian; since this matter has nothing in common with the respective rights of the parties to this suit that cause should be remanded to the Monmouth County Court for trial and a guardian *ad litem* appointed for the infants in view of the possible conflict of interest between the children and their mother as their natural parent. It appears that these bonds were not purchased with any funds supplied by the husband or wife but by their grandparents on their maternal side, and that originally the bonds were in the names of the children but since have been changed to the names of the children or their mother.

Those parts of the judgment of the trial court setting aside and vacating the decree of the Nevada court dated June 30, 1952, and further declaring the respondent a full partner in Nappe-Smith Manufacturing Company and Farmingdale Realty Company, and allowing her maintenance

under the statute, are reversed. The balance of the judgment is modified and remanded to be proceeded with consistent with this opinion. No costs.

VANDERBILT, C. J. (dissenting). I do not believe that the majority of the court would have reached the conclusion they did in this case were it not for what the Supreme Court of the United States said in *Davis v. Davis*, 305 *U. S.* 32, 59 *S. Ct.* 3, 83 *L. Ed.* 21 (1938); *Sherrer v. Sherrer*, 334 *U. S.* 343, 68 *S. Ct.* 1087, 1097, 92 *L. Ed.* 1429 (1948); *Coe v. Coe*, 334 *U. S.* 378, 68 *S. Ct.* 1094, 92 *L. Ed.* 1451 (1948). But I cannot bring myself to believe that the Supreme Court of the United States by such expressions intended to countenance the conduct we find present in this case.

The constitutional guarantee of full faith and credit to a foreign judgment does not require adherence to the ideal when to do so would be as grotesquely incongruous with the idea of justice as it is in this case. This concept controlled our action in *Staedler v. Staedler*, 6 *N. J.* 380 (1951), and I see no reason to depart from our view there that:

"* * * No matter what others may perceive to be the recent trend in the decisions of the United States Supreme Court in causes of this type we are constrained not to impute to that court an intent that would reduce the solemn relationship of husband and wife to the status just adverted to or that that court will acquiesce in a fraudulent scheme to use the principles of the *Davis*, *Sherrer and Coe* cases as a device to infuse constitutional virility into the judgment of a court of a sovereign state which has been deliberately deceived in proceeding to judgment in a cause over which in fact it had no jurisdiction."

The plaintiff brought this action to set aside a decree of divorce which the defendant obtained in the State of Nevada on a counterclaim entered by him in an action for divorce commenced by her. The proceeding was adversary only in form; in reality it was of the "consentual" type, bought and paid for by the defendant for his convenience, with all of the fraudulent elements heretofore condemned by us, *Staedler v. Staedler, supra; In re Rubin,* 7 *N. J.* 507 (1951),

but with the added deception of turning the fraudulently conceived proceeding for divorce to his own favor.

I am impressed by the findings of fact made by Judge McLean in the opinion filed by him and by the subsequent findings made by Judge Nimmo to whom the matter was assigned after Judge McLean's retirement. The plaintiff and the defendant were married in January 1938. Two children were born of the marriage. The marriage had taken place in Farmingdale, New Jersey, and the parties lived in that vicinity throughout their married life. In 1943 the plaintiff became suspicious of the defendant's attentions to other women and because of this some disagreement resulted. Their differences were apparently reconciled to a certain degree. In 1947 they were living in a rather substantial home at Colt's Neck, New Jersey, which was valued at approximately $60,000. By this time it was established that the defendant's interest in other women was "more real than fanciful" and had caused a definite estrangement. They consulted the defendant's attorney to work out their difficulties. When this attorney found that there were divergent interests involved he requested the plaintiff to retain her own counsel. He suggested several attorneys, one of whom she did consult. A reconciliation was effected and thereafter the Colt's Neck home was sold and the net proceeds deposited in their joint bank account. Subsequent to that time, pending the finding of a new home, they lived at various places. In the summer of 1951 they were living in a motel at the New Jersey shore while the two boys were away at camp. During the occasions of their visits to the children at camp over weekends the plaintiff charged the defendant with being overly friendly with a female entertainer and this caused another cleavage between them. The plaintiff continued to reside at the motel where they were living, but the defendant left her and took up quarters at Farmingdale. This was in July 1951, and they did not live together thereafter. Because of the irregular intervals at which the defendant provided support for the plaintiff she found it necessary to consult her attorney again in January and February 1952. There-

after regular support payments were made to the plaintiff by the defendant.

There seems to be no question as to the impropriety of the conduct on the part of the defendant at this time. On cross-examination he testified that he was living in Red Bank in an apartment occupied by himself, his son (evidently only one of them) and a woman whom he subsequently married after the Nevada divorce.

The settlement negotiations between the plaintiff and the defendant, through their attorneys, continued. The plaintiff testified that her New Jersey attorney sent her to a Clyde Souter, an attorney of Reno, Nevada, who is a specialist in divorce matters and who knows of the efforts of our courts to stamp out the making of arrangements here for violating our law by fraudulent divorces in Nevada. She left for Reno in May 1952 and received $1,000 from the defendant and a 1952 Mercury automobile to make the trip. The defendant evidently knew that the plaintiff was not going to make Reno her permanent residence. She was accompanied to Reno by the younger of the two boys. On arrival in Reno on May 11, 1952 she went to the office of Souter and talked with him about the case. She told him she was not going to remain in Nevada permanently. They waited for the terms that were to go into the agreement between the plaintiff and the defendant for support, since they were being prepared in New Jersey. There were telephone calls from Souter to New Jersey counsel and the final settlement agreement was not completed until the defendant, to the plaintiff's surprise, arrived in Reno several days before the divorce hearing. The defendant at that time was accompanied by another woman and "a fellow named George," whose last name the defendant could not remember, or never knew. All he knew about him was that he was from New York and went along for the ride. On his arrival in Reno, the defendant retained Kendrick Johnson to represent him. The plaintiff testified that Souter told her that the defendant first reported to him and that he recommended Johnson.

To the proceedings that were started by Souter on behalf

of the plaintiff, the defendant filed a counterclaim charging the plaintiff with extreme cruelty. On June 30, 1952, six weeks after the arrival in Nevada of the plaintiff, the case came on for hearing before the Reno court. On the day of the hearing the settlement agreement between the plaintiff and the defendant was concluded in the office of Souter, according to the terms that had been agreed upon in New Jersey. The defendant contended that he protested against including the provision for the purchase of a house for the plaintiff, and this resulted in a telephone call from Souter's office to the attorney in New Jersey for the defendant, in the presence of the parties and their Nevada counsel. The term was ultimately included.

At the divorce hearing Souter had produced the plaintiff as his witness; he examined her as to her residence and the agreement, but asked her no questions to support her claim for divorce. Johnson, the defendant's attorney, did not cross-examine her. Souter then told the plaintiff to step down and leave the courtroom. Johnson then had the defendant take the stand and testify as to his counterclaim. Souter did not cross-examine the defendant, nor did he call the plaintiff to deny the charges against her. Thereupon judgment was entered for the defendant on the counterclaim embodying the terms of the settlement agreement between the plaintiff and the defendant. That afternoon, Mr. Souter was paid by the defendant. A point is attempted to be made that the defendant did not pay Souter, but that the money came by telegraph addressed to Souter's office. It appears, however, that the $1,000 paid was sent at the instance of the defendant and he knew what it was for.

The plaintiff was not informed by any one of the counterclaim until she was told after the hearing that her husband had been granted a divorce from her on the ground of extreme cruelty.

Two days later the plaintiff started her return journey to New Jersey in the car which the defendant had provided, headed for Shrewsbury to occupy the house which the defendant had agreed that she should have. The defendant returned

to Red Bank with his woman companion and two months later he married her. He had taken the precaution not to close title on the premises he gave to the plaintiff until his return from Reno, and it was not until that was done that he completed the agreement made by paying the plaintiff's New Jersey attorney.

The trial court found that during the month of April 1952, prior to the departure for Reno, and while the parties were still residing in New Jersey, they agreed that the plaintiff should go to Nevada to obtain a divorce and that the husband would pay all her expenses including counsel fees, both in Nevada and New Jersey, and that he would provide her with an automobile and the expenses of the trip; that on her return he would provide her with a house to live in and $100 a week support for herself and the children, and would assign to her 49% of the stock of the Farmingdale Realty Company as security for the payment and would maintain insurance policies on his life in the amount of $20,000 payable to her as beneficiary with irrevocable designation.

In November 1952, after securing performance as aforesaid of the agreement, the plaintiff through her present attorney brought this action.

It is the defendant's contention generally that the Nevada decree is entitled in its entirety to full faith and credit by this State and such being the case is *res judicata* as to the divorce and also as to all other issues raised by the plaintiff in this action. This contention of the defendant finds support only if we view the existing facts concerning the trip to Nevada and the preliminary arrangements made here as strictly adversary in nature and according to the narrow and tenuous inferences drawn by the defendant. I reach a contrary conclusion and believe that the case of *Staedler v. Staedler*, 6 *N. J.* 380 (1951) is entirely dispositive of this point. In speaking of the *Davis v. Davis*, 305 *U. S.* 32, 59 *S. Ct.* 3, 83 *L. Ed.* 26 (1938); *Sherrer v. Sherrer*, 334 *U. S.* 343, 68 *S. Ct.* 1087, 1097, 92 *L. Ed.* 1429 (1948); and *Coe v. Coe*, 334 *U. S.* 378, 68 *S. Ct.* 1094, 92 *L. Ed.*

1451 (1948), cases cited by the defendant in this proceeding, we said in *Staedler v. Staedler, supra,* 6 *N. J.,* at *page* 390:

"We have carefully considered these cases and we do not believe that the full faith and credit clause of the Federal Constitution was ever intended to be used as a shield for or to give validity to the type of contract here under consideration or to approve the acts performed pursuant thereto in cases where the ultimate purpose was to commit a fraud upon the jurisdiction of a court of one of the several sovereign states. Jurisdiction depends upon the existence of basic facts and a *bona fide* finding that the necessary facts actually exist, and where they do not exist it cannot be conferred upon any court anywhere by consent of the parties or by fraud. It presupposes a *bona fide* examination by a court of competent jurisdiction of such facts before any judgment can be entered by such court.

It cannot be disputed in this case that the *bona fide* domicile of these parties was and is in the State of New Jersey and that this State has a paramount interest in the status of its married domiciliaries. * * *"

The purpose of the agreement, negotiated here in New Jersey and subsequently manifested by the document prepared in Nevada and included in the terms of the divorce decree, without any doubt was to effect a "friendly," even though illegal, divorce proceeding according to the swift and convenient practice of Nevada, without any idea that there was to be established a *bona fide* residence for either party in Nevada. As Judge McLean in his original opinion below stated with reference to the Nevada decree:

"Unquestionably, it was the product of fraud upon the jurisdiction of Nevada in which both plaintiff and defendant participated and this fraud had its inception and is grounded in the agreement made in New Jersey during the month of April, 1952."

Contracts which have as their basic purpose the divorce of the parties thereto are contrary to public policy, illegal and void. See authorities cited in *Staedler v. Staedler, supra,* 6 *N. J.* 380, at *page* 389. I find no difficulty in agreeing with the trial court's conclusion that the agreement for this specific purpose was made in this State, and the performance thereof entered upon here and consummated in the State of

Nevada. We should not have to stand by, out of respect for the full faith and credit clause, and waive the operation of our law upon a judgment procured in violation thereof, when in truth and in fact it is also a fraud upon the court rendering the divorce decree to have procured the same under these circumstances.

The *Davis, Coe* and *Sherrer* cases, *supra,* stand for nothing more than the proposition that full faith and credit must be given by the courts of one state to a decree of a sister state so as to bar any collateral attack on jurisdictional grounds, not permitted by the rendering state itself, where the attacking party participated in the action giving rise to the decree or judgment and was accorded a full opportunity to be heard. In the *Staedler* case, *supra,* we understood this principle to apply only to true adversary proceedings, where absolute independence and voluntariness prevailed and where the application of the full faith and credit doctrine operated to advance justice rather than to give shield to a fraud upon the courts.

The case of *Isserman v. Isserman,* 11 *N. J.* 106 (1952) principally relied upon by the majority as dispositive of this issue before us, turned on the fact that it was a true adversary proceeding and, therefore, is factually at odds with this case. The elements of independence and voluntariness controlled the wife's actions in the *Isserman* case, while here these fundamental ingredients of the doctrine expounded by the *Davis, Coe* and *Sherrer* cases have been found by the trial court, and I think correctly, factually not to exist.

By approving the defendant's course of conduct our court is suggesting an ingenious scheme to avoid any of the entanglements indicated by the *Staedler* and *Isserman* cases by having the divorce granted to the husband on his counterclaim to the wife's action. The conduct of Souter, the wife's Nevada counsel, in failing to introduce any testimony on her behalf as to the merits of her complaint for divorce or in failing to cross-examine the husband as to his testimony given to sustain the merits of his cross-claim for divorce, in view of the factual indications that the wife understood

that she was to go to Nevada and procure a divorce, lead to but one conclusion—that the husband dominated the entire situation from beginning to end, even to the suppression of a suit for his all too obvious adultery. Furthermore, I see only "extrinsic" fraud perpetrated by the husband in falsely testifying before the Nevada court that he had no knowledge or information sufficient to form a belief as to the allegations of his wife concerning the *bona fides* of her residence in the State of Nevada, when he actually knew by virtue of the agreement made that she was to live in a house in Shrewsbury, New Jersey, to be provided for by him. An added feature of the defendant's scheme, if successful, is that it saves him the tedium of establishing a seeming "residence" in Nevada.

In a case as vigorously contested as this one was, we are bound to follow the findings of the trial judge, unless there are no reasonable bases in the evidence for sustaining them, *R. R.* 1:5–3.

Accordingly, I would vote to affirm the judgment of the court below except insofar as it holds that the plaintiff was a full partner in the Farmingdale Realty Corporation and the Nappe-Smith Manufacturing Company and entitled to an accounting for her interest in these corporations. The only basis for such holding is the alleged statements made by the defendant to the plaintiff that she was a full partner which are denied by the defendant; the fact that the parties had joint bank accounts prior to their marital discord and held realty as tenants by the entirety; and the fact that the plaintiff had shares of stock issued in her name although she never saw them.

The plaintiff's contention that she was a partner in these enterprises stands uncorroborated in even the slightest understandable degree. The joint bank accounts and the holding of real property by the entirety could be incidents of the marriage relationship, totally unrelated to any similar intent with respect to the business managed and carried on by the husband, and to hold such flimsy proof as sufficient to corroborate a claim of partnership would be to place serious

incidental consequences upon joint property holding. Further, the record indicates that two shares of common stock of the Nappe-Smith Manufacturing Company were issued in the plaintiff's name and the certificate was endorsed by her in blank. The total outstanding shares of this company were ten shares of common stock, of which the other eight were held in the name of the defendant with the exception of one share in the name of the defendant's secretary, and 1909 and a fraction shares of preferred stock all of which were held by the defendant. At no time was there ever any more than one share of the Farmingdale Realty Company stock issued in the plaintiff's name. The plaintiff admitted she had never paid anything for her alleged interest in either of these corporations and there is no basis in fact or law for holding any gift of the alleged partnership interest in her.

Mr. Justice HEHER has authorized me to say that he joins in this opinion.

WACHENFELD, J., concurring in result.

*For reversal in part*—Justices OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—5.

*For affirmance*—Chief Justice VANDERBILT, and Justice HEHER—2.