CHRISTINE MADISON SPEARING SCHLEMM, PLAIN-
TIFF-RESPONDENT-CROSS-APPELLANT, v. WILLIAM
SCHLEMM, DEFENDANT-APPELLANT-CROSS-RESPOND-
ENT.

Argued December 7 and 8, 1959—Decided February 22, 1960.

558

*Mr. Leon S. Milmed* argued the cause for the plaintiff-respondent-cross-appellant (*Messrs. Milmed & Rosen,* attorneys; *Mr. John C. Stritehoff, Jr.,* on the brief).

*Mr. Otto E. Riemenschneider* argued the cause for the defendant-appellant-cross-respondent (*Mr. Charles F. Krause, III,* on the brief).

The opinion of the court was delivered by

JACOBS, J. The parties cross-appealed from a judgment entered in the Chancery Division. We certified their appeals on our own motion while they were pending in the Appellate Division.

The parties were married in 1933 and lived together in New Jersey until 1953. No children were born of their marriage. In 1952 the plaintiff-wife filed her complaint in the Chancery Division seeking a divorce and support and maintenance and the defendant-husband filed his answer and counterclaim seeking a divorce. On July 22, 1953 they both appeared in the Chancery Division with their counsel who advised the court that the parties had reached a mutual understanding which was then fully set forth in the record and which was to the following effect: The complaint and counterclaim in the Chancery Division were to be dismissed; the defendant agreed to convey to the plaintiff his interest in property located at 639 Ocean Avenue, Sea Girt, New Jersey and owned by the parties as tenants by the entirety; the defendant agreed to give the plaintiff a bill of sale for the contents of the house located at Sea Girt; the defendant agreed to give the plaintiff $3,000 in cash, she in turn was to waive any rights to the personal property and contents in the house located at Columbia Terrace, Weehawken, New

Jersey and owned by the parties as tenants by the entirety, and no conveyance or change of any kind was to be made in the title to the Weehawken property; the defendant agreed to transfer to the plaintiff a Cadillac automobile and to provide and maintain proper insurance on it; and the defendant "agreed to provide for the wife to maintain the properties and upkeep and further carrying charges just in the manner that he has been doing up to the present date so that she will be provided for in the same manner and to the same degree as she has been provided for by him up to this time." Immediately after the mutual understanding was set forth in the record the court requested that counsel present "a conformable Order with this conclusion to dismiss"; the formal order was not actually entered until September 25, 1953. It bore consents by counsel for both parties, stated that the parties had personally appeared before the court on July 22, 1953, had advised through their counsel that they had reached an amicable settlement and had embodied the terms of their settlement in the record, and adjudged that the complaint and counterclaim "be and the same are hereby dismissed, without prejudice, as of July 22nd, 1953."

After leaving the courtroom on July 22, 1953 the defendant transferred his interest in the Sea Girt property to the plaintiff and gave her $3,000 in cash; apparently the Cadillac automobile was also duly transferred to her. On the same day Mr. Robert Spearing, the plaintiff's son by a previous marriage, placed approximately $50,000 belonging to the defendant in a safe deposit box in the Commonwealth Trust Company. On July 25, 1953 the defendant left for Reno, Nevada and shortly thereafter he consulted Mr. Souter, a Nevada attorney, with regard to a divorce. Under date of July 30, 1953 Mr. Souter wrote to the plaintiff advising that the defendant had consulted him and enclosing a power of attorney by which the plaintiff could authorize an attorney to appear on her behalf. Mr. Souter's letter stated that he was suggesting that she select Mr. Johnson as her attorney on the assumption that she was not

familiar with Nevada attorneys but that she should feel free to substitute "the name of any other attorney in Reno." Mr. Souter's letter concluded with the comment that if she desired "to seriously contest any action for divorce which Mr. Schlemm may institute here" then she should disregard his letter and that "in any event, I strongly recommend that you take my letter and the Power of Attorney to competent counsel and be advised by him." Under date of August 1, 1953 the plaintiff wrote to Mr. Souter stating that she would be glad to do as suggested "immediately upon Mr. Schlemm's settling with me for the Insurance Policy which I hold in the amount of $20,000" and "if he will forward me a check for half of this amount I shall execute the power and send it to Mr. Johnson together with the policy." On August 6, 1953, after a conference with her son Mr. Spearing and her nephew Mr. Kenneth W. Higgins, the plaintiff delivered to her son the power of attorney which had been signed by her and had been notarized in New York; Mr. Higgins, who was a notary public of New Jersey, also affixed his name and notarial seal to the power of attorney and it was then mailed to Nevada. On the following day, August 7, 1953, Mr. Spearing took the $50,000 from the safe deposit box in the Commonwealth Trust Company and delivered it to the plaintiff.

On September 8, 1953 Mr. Schlemm and his attorney Mr. Souter appeared in the Second Judicial District Court of the State of Nevada in and for the County of Washoe to prosecute his divorce complaint which charged the defendant with mental cruelty. An answer was filed by Mr. Johnson as attorney for Mrs. Schlemm, acting pursuant to the power of attorney. The answer alleged, as a separate defense, that Mr. Schlemm's residence was not *bona fide* but was "a simulated residence, acquired solely for the purpose of laying a jurisdictional basis for an action for divorce." Mr. Schlemm testified on direct examination that he had resided in Nevada since July 25, 1953 and that he had come there with the intention of making Nevada his "permanent home for an

indefinite period." On cross-examination by Mr. Johnson, Mr. Schlemm stated that it was his intention to make Nevada his home for an indefinite period and that he had no present intention of becoming a citizen of any state other than Nevada. In its findings of fact and conclusions of law, the court determined that Mr. Schlemm was a *bona fide* resident of Nevada, that the court had jurisdiction of the parties and the subject matter of the proceeding, that Mr. Schlemm had established the allegations of his complaint, and that he was entitled to a decree of divorce. The formal decree of the Nevada court was entered on September 8, 1953 and, after referring to the findings of fact and conclusions of law, adjudged that Mr. Schlemm "be, and he hereby is, granted a decree of divorce," final and absolute in form and that "the bonds of matrimony now and heretofore existing" between Mr. and Mrs. Schlemm "are fully, completely and forever dissolved." Shortly after the entry of the decree Mr. Schlemm returned to New Jersey.

On August 7, 1957 the plaintiff Mrs. Schlemm executed deeds which conveyed to the defendant Mr. Schlemm her interest in the property located at Columbia Terrace, Weehawken and in property which is located in Union City and had been conveyed to Mr. and Mrs. Schlemm in 1936. For the execution of these deeds Mr. Schlemm paid $25,000 to Mrs. Schlemm and $2,500 to her counsel. Both of the deeds described Mrs. Schlemm as unmarried although in an agreement dated August 7, 1957, which accompanied the execution of the deeds, Mrs. Schlemm purported to reserve "any and all rights or claims she may have to challenge and attack the legality and validity" of the divorce proceedings in Nevada. On February 20, 1958 the plaintiff filed a complaint in the Chancery Division which set forth the agreement or understanding between the parties which was placed on the record in open court on July 22, 1953, alleged that the defendant had failed to comply with that portion of the agreement or understanding which related to her support and demanded a judgment declaring the Nevada divorce to

be of no force and effect and directing the defendant to provide suitable support and maintenance and to pay all sums due under the agreement of July 22, 1953. The defendant filed an answer which asserted that the Nevada divorce was entitled to full faith and credit in the courts of New Jersey, denied that he was under any obligation to support or maintain the plaintiff and advanced the additional defenses of unclean hands and laches.

After taking evidence and hearing argument the Chancery Division made its determinations and entered its judgment dated January 16, 1959 from which the parties have cross-appealed. It found that, since Mrs. Schlemm had voluntarily submitted herself to the jurisdiction of the Nevada court and had appeared in the Nevada proceeding through her counsel, Mr. Johnson, who had been authorized to appear for her by her power of attorney, the Nevada divorce decree was entitled to full faith and credit in our courts under the explicit holdings of the United States Supreme Court in *Sherrer v. Sherrer*, 334 *U. S.* 343, 68 *S. Ct.* 1087, 1097, 92 *L. Ed.* 1429, 1 *A. L. R.* 2d 1355 (1948) and *Coe v. Coe*, 334 *U. S.* 378, 68 *S. Ct.* 1094, 92 *L. Ed.* 1451, 1 *A. L. R.* 2d 1376 (1948). See *Nappe v. Nappe*, 20 *N. J.* 337, 343 (1956) ; *Isserman v. Isserman*, 11 *N. J.* 106, 113 (1952). In addition, it concluded that the plaintiff did not come into equity with clean hands and was guilty of *laches*, citing *Sleeper v. Sleeper*, 129 *N. J. Eq.* 94 (*E. & A.* 1941). See *Woodhouse v. Woodhouse*, 11 *N. J.* 225, 229 (1953) ; *Judkins v. Judkins*, 22 *N. J. Super.* 516, 537 (*Ch. Div.* 1952) ; *cf. Untermann v. Untermann*, 19 *N. J.* 507, 519 (1955).

The Chancery Division also found that the understanding between the parties embodied in the records of the court on July 22, 1953 was a fair and just agreement which remained in full force and effect and was not in any wise altered by the Nevada decree which made no mention of it and did not purport to affect it. See *Hettich v. Hettich*, 304 *N. Y.* 8, 105 *N. E.* 2d 601 (1952) ; *cf. Equitable Life Assur. Society of United States v. Kretzschmar*, 21 *N. J.* 129, 135

(1956). It construed and applied the July 22, 1953 agreement in the light of the evidence introduced before it and adjudged (1) that the defendant pay to the plaintiff the sum of $37,273.53, representing arrearages from July 22, 1953 to the date of the judgment, for the support of the plaintiff and for expenditures made by her for taxes, insurance, utilities and heat in connection with the Sea Girt property and for medical expenses incurred by her, (2) that the defendant pay $100 per week, commencing on the date of the judgment, for the plaintiff's support and pay expenses incurred thereafter for taxes, insurance, utilities and heat in connection with the Sea Girt property and for medical expenses incurred by her, (3) that no allowance be made to the plaintiff for capital improvements or repairs made by her to the Sea Girt property or for furniture purchased or to be purchased for use therein, and (4) that the defendant pay a counsel fee of $7,500 and costs. The plaintiff's appeal is from so much of the judgment as gives full faith and credit to the Nevada decree and refuses to give her an allowance for capital improvements, repairs and furniture at the Sea Girt property. The defendant's appeal is from so much of the judgment as provides for enforcement of the support and maintenance provisions of the agreement of July 22, 1953 and the allowance of the counsel fee to the plaintiff's attorney.

No purpose would be served by reviewing the state or federal authorities prior to *Sherrer v. Sherrer, supra* and *Coe v. Coe, supra,* for it is beyond dispute that these opinions of the United States Supreme Court now bind us to honor Nevada divorce decrees in instances where the Nevada courts have made jurisdictional findings of domicil in proceedings in which both parties have participated. In the *Sherrer* case the Supreme Judicial Court of Massachusetts struck down a Florida divorce which the wife had obtained in a proceeding in which the husband appeared personally and through counsel and in the *Coe* case the same court struck down a Nevada divorce which the wife had obtained on her

cross-complaint in a proceeding instituted by her husband. The Massachusetts court found that the parties were domiciled in Massachusetts and not in Florida or Nevada and that it was not obliged to accept the jurisdictional findings of domicil which were made in the Florida and Nevada proceedings. See *Sherrer v. Sherrer,* 320 *Mass.* 351, 69 *N. E. 2d* 801 (1946); *Coe v. Coe,* 320 *Mass.* 295, 69 *N. E. 2d* 793 (1946). In reversing, the United States Supreme Court held that the full faith and credit clause of the Federal Constitution compelled recognition by the Massachusetts courts of the validity of the Florida and Nevada divorce decrees; in the course of his opinions for the court, Chief Justice Vinson stressed that the clause was incorporated into the Constitution as a means of national unification and that its sympathetic application without regard to varying local state policies was an essential of our federal system. See *Johnson v. Muelberger,* 340 *U. S.* 581, 584, 71 *S. Ct.* 474, 476, 95 *L. Ed.* 552, 556 (1951):

"From judicial experience with and interpretation of the clause, there has emerged the succinct conclusion that the Framers intended it to help weld the independent states into a nation by giving judgments within the jurisdiction of the rendering state the same faith and credit in sister states as they have in the state of the original forum. The faith and credit given is not to be niggardly but generous, full. '[L]ocal policy must at times be required to give way, such "is part of the price of our federal system." '

This constitutional purpose promotes unification, not centralization. It leaves each state with power over its own courts but binds litigants, wherever they may be in the Nation, by prior orders of other courts with jurisdiction. 'One trial of an issue is enough. "The principles of *res judicata* apply to questions of jurisdiction as well as to other issues," as well to jurisdiction of the subject matter as of the parties.' The federal purpose of the clause makes this Court, for both state and federal courts, the 'final arbiter when the question is raised as to what is a permissible limitation on the full faith and credit clause.' " 340 *U. S.,* at *page* 584, 71 *S. Ct.,* at *page* 476, 95 *L. Ed.,* at *page* 556.

See also *Estin v. Estin,* 334 *U. S.* 541, 545, 68 *S. Ct.* 1213, 92 *L. Ed.* 1561, 1567, 1 *A. L. R. 2d* 1412, 1417 (1948).

Any doubts which may have been originally entertained (*cf. Staedler v. Staedler,* 6 *N. J.* 380 (1951)) as to the sweep of *Sherrer* and *Coe* have been fully dissipated by later expressions in the Supreme Court and elsewhere. Thus in *Johnson, supra,* the court after referring to the constitutional clause and its treatment in the earlier cases dealing with foreign divorces, and after noting that in *Sherrer* a Florida divorce, "where both parties appeared personally or by counsel," was held binding, had this to say:

> "It is clear from the foregoing that, under our decisions, a state by virtue of the clause must give full faith and credit to an out-of-state divorce by barring either party to that divorce who has been personally served or who has entered a personal appearance from collaterally attacking the decree." 340 *U. S.,* at *page* 587, 71 *S. Ct.,* at *page* 477, 95 *L. Ed.,* at *page* 557.

See *Cook v. Cook,* 342 *U. S.* 126, 72 *S. Ct.* 157, 96 *L. Ed.* 146 (1951); *cf. Griswold, "Divorce Jurisdiction and Recognition of Divorce Decrees—A Comparative Study,"* 65 *Harv. L. Rev.* 193, 216 (1951), where the Dean, after referring to *Sherrer, Coe* and *Johnson,* stated their effect to be that "where the absent spouse participates in divorce proceedings by appearance (which may be through an attorney), by filing an answer, or by otherwise taking part, the divorce which is granted is binding and effective, and must be recognized in other states." He noted further that this was not necessarily a determination that the court had jurisdiction to grant divorce but depended rather "upon a rule that the participating spouse is precluded by *res judicata* from questioning that jurisdiction." See *Paulsen, "Divorce Jurisdiction by Consent of the Parties—Developments Since 'Sherrer v. Sherrer',"* 26 *Ind. L. J.* 380 (1951); *Bozeman, "The Supreme Court and Migratory Divorce: A Re-examination of an Old Problem,"* 37 *A. B. A. J.* 107 (1951).

In *Chittick v. Chittick,* 332 *Mass.* 554, 126 *N. E.* 2d 495 (1955), the wife left Massachusetts for the Virgin Islands, obtained a divorce there after six weeks' residence, and returned to Massachusetts; the husband did not go to the

Virgin Islands but his appearance in the divorce proceeding was entered through counsel acting pursuant to a power of attorney. In a later Massachusetts action by the wife for separate maintenance, the trial judge found that neither the wife nor the husband had ever been domiciled in the Virgin Islands, that the husband had joined with his wife in obtaining a Virgin Islands decree of divorce and had entered into an agreement in which she was to receive a stipulated payment on the entry of the decree, and that the divorce was the result of fraud and collusion. This finding was set aside by the Supreme Judicial Court of Massachusetts in an opinion which held that under *Sherrer* and *Coe,* the Virgin Islands divorce was entitled to full faith and credit in the courts of Massachusetts; in his opinion for the court, Chief Justice Qua pointed out that "there was no evidence of fraud committed by either of the parties upon the other" and that the issue of collusion in the Virgin Islands proceeding "must be presumed to have been determined there, and full faith and credit must be given to that determination." 126 *N. E.* 2*d,* at *page* 498.

In *In re Day's Estate,* 7 *Ill.* 2*d* 348, 131 *N. E.* 2*d* 50 (1955), the Illinois Supreme Court rejected an attack on a Nevada divorce which the wife had obtained against her husband who never went to Nevada but whose appearance was entered by counsel acting under a power of attorney; in the course of his opinion for the court, Justice Klingbiel made these remarks which are particularly pertinent here:

"Appellee seeks to distinguish the present case from the *Sherrer* and *Coe* cases on the ground that in each of the cited cases both husband and wife were personally present in the foreign court and participated 'actively' in the proceedings, whereas in the case at bar the husband was not personally present in Nevada and his only personal participation in the proceedings consisted of signing the power of attorney. It is further complained that her husband joined with Mrs. Allison in a fraudulent attempt to confer jurisdiction on the Nevada court.

In answer to this argument it is sufficient to say that the *Sherrer* and *Coe cases* did not predicate their holdings upon the extent of defendant's activity in the divorce proceedings, but rather upon the

fact that he entered an appearance and had the opportunity to contest the jurisdictional issues. It can hardly make a rational difference that the question of domicile is in fact vigorously contested. The extent of activity, contest or participation must vary in almost every case, and it is not in the interest of stability and permanency of divorce decrees, rights of property and other important rights dependent thereon, that such indefinite criteria determine the question of validity. That appellee's position is without merit is evident from the decision in *Chittick v. Chittick*, [332] *Mass.* [554], 126 *N. E.* 2d 495, where the rule of the *Sherrer* and *Coe* cases was applied even though the defendant husband appeared in the foreign jurisdiction only through counsel and took no more active part in the litigation than did the husband in the divorce proceeding involved in this case. In that case, as in the case at bar, the plaintiff wife went to the foreign jurisdiction, stayed at hotels, engaged in no business or occupation, filed her complaint immediately upon the expiration of the six-weeks period, and left the day after the decree. It was held that complaints of fraud or collusion in persuading the foreign court it had jurisdiction were foreclosed under the holdings in the *Sherrer* and *Coe* cases. We conclude that Mrs. Allison's divorce decree was valid and entitled to full faith and credit, and that her subsequent marriage to the testator was a valid one." 131 *N. E. 2d,* at *pages* 52–53.

Other cases have expressed views which are substantially in accord with those voiced in *In re Day's Estate, supra.* See *Boxer v. Boxer,* 12 *Misc.* 2d 205, 177 *N. Y. S.* 2d 85 (*Sup. Ct.* 1958), affirmed 7 *A. D.* 2d 1001, 184 *N. Y. S.* 2d 303 (*App. Div.* 1959); *In re Raynor's Estate,* 165 *Cal. App.* 2d 715, 332 *P.* 2d 416 (*Ct. App.* 1958); *Phillips v. Phillips,* 15 *Misc.* 2d 884, 180 *N. Y. S.* 2d 475 (*Sup. Ct.* 1958); *Drinkwater v. Drinkwater,* 111 *F. Supp.* 559 (*D. C. D. C.* 1953); *Anonymous v. Anonymous,* 7 *Terry* 458, 46 *Del.* 458, 85 *A.* 2d 706, 720 (*Super. Ct.* 1951), affirmed *sub nom. Du Pont v. Du Pont,* 8 *Terry* 231, 47 *Del.* 231, 90 *A.* 2d 468 (*Sup. Ct.* 1952), *certiorari* denied 344 *U. S.* 836, 73 *S. Ct.* 46, 97 *L. Ed.* 651 (1952); *Steffens v. Steffens,* 408 *Ill.* 150, 96 *N. E.* 2d 458 (*Sup. Ct.* 1951); *cf. Isserman v. Isserman, supra; Woodhouse v. Woodhouse, supra; Nappe v. Nappe, supra; Roskein v. Roskein,* 25 *N. J. Super.* 415, 424 (*Ch. Div.* 1953); *Miele v. Miele,* 25 *N. J. Super.* 220 (*Ch. Div.* 1953); *Judkins v. Judkins, supra.* In *Wood-*

*house v. Woodhouse, supra,* the parties entered into a property settlement and the wife went to Nevada where she obtained a divorce in a proceeding in which the husband entered a general appearance but made "no attack on the jurisdictional facts." See 20 *N. J. Super.* 229, at *page* 238. The husband remarried and thereafter the wife sued in New Jersey for arrearages of alimony under the Nevada decree. The husband sought to attack the Nevada divorce but this court, after citing *Sherrer, Coe* and *Johnson,* held that the Nevada decree was entitled to full faith and credit since the husband had "entered a general appearance and actually appeared through counsel in the Nevada proceedings" and "had an opportunity to litigate the issues, including jurisdiction, though he did not avail himself of that opportunity." 11 *N. J.,* at *page* 228. Justice Oliphant, in his opinion for the entire court, distinguished his earlier opinion in *Staedler v. Staedler, supra,* on the ground that in *Staedler* the wife "was not represented by counsel of her own choice and she had no opportunity to make a voluntary decision on the question as to whether or not she should fully litigate either the jurisdiction of the foreign state or the merits of the case." 11 *N. J.,* at *pages* 228–229.

In *Nappe v. Nappe, supra,* the trial court found that the parties, while resident in New Jersey, agreed that the wife would go to Nevada to obtain a divorce and the husband would pay her expenses of the trip and on her return would provide her with a house and support. She went to Nevada where she retained Mr. Souter as her attorney. Her husband also went to Nevada and retained Mr. Johnson as his attorney, apparently on Mr. Souter's recommendation. The wife filed her complaint for divorce, the husband counterclaimed, and after a hearing during which there was no cross-examination by either party a divorce was entered in the husband's favor. The parties returned to New Jersey and in a later proceeding by the wife, this court held that under *Sherrer, Coe* and *Johnson* the Nevada divorce was entitled to full faith and credit in our courts. Justice

Oliphant pointed out that it mattered not what the local views might be since "our public policy must bow to the constitutional principles set forth in those cases by the United States Supreme Court." 20 *N. J.*, at *page* 342. He noted that the *Staedler* case "was based upon specific and particular facts peculiar to it" and that it must be confined to those facts (20 *N. J.*, at *page* 344), and expressed the view that on jurisdictional facts such as those shown in the record before him, Nevada decrees were immune from attack "except under the doctrine of the second *Williams* case, *Williams v. State of North Carolina,* 325 *U. S.* 226, 65 *S. Ct.* 1092, 89 *L. Ed.* 1577 (1945), which is only applicable to cases where the jurisdiction of the Nevada court is based upon an order of publication and substituted service and the decree is entered in an *ex parte* proceeding." 20 *N. J.*, at *page* 341.

 The strength of our democracy rests largely upon the constitutional guarantees which the courts enforce and the greatness of our nation is measured largely by the readiness of its people to accept and observe constitutional interpretations and applications by the designated final arbiter, the United States Supreme Court. We, as state judges, would indeed disserve the interests of our country if, because of conflicting local policies, we in any wise sought to disregard or evade the decisions of the Supreme Court as to the meaning and effect of the Federal Constitution. See *De Gategno v. De Gategno,* 336 *Mass.* 426, 146 *N. E. 2d* 497, 499 (*Sup. Jud. Ct.* 1957); *Aufiero v. Aufiero,* 332 *Mass.* 149, 123 *N. E. 2d* 709, 711 (*Sup. Jud. Ct.* 1955). The evidence presented in the instant matter patently brought the Nevada divorce within the pronouncements in *Sherrer, Coe* and *Johnson* and the trial court properly refused to declare it invalid. The wife had voluntarily and understandingly participated in her husband's Nevada divorce proceeding through counsel acting in accordance with her power of attorney and the ensuing divorce, based on the Nevada court's jurisdictional finding of domicil and cause for divorce under its statutes,

was entitled to full faith and credit in our courts. Furthermore there are equitable principles which may well be invoked here to bar her collateral attack on the Nevada divorce in which she participated. See *Sleeper v. Sleeper, supra; Woodhouse v. Woodhouse, supra; Untermann v. Untermann, supra; Judkins v. Judkins, supra.* In the *Judkins* case Judge Goldmann noted that our courts have not hesitated to import into divorce actions "maxims and rules commonly applied in equity suits" and that "among the circumstances which may be material are unclean hands, laches, undue delay, or the generally inequitable conduct of the party seeking relief." 22 *N. J. Super.,* at *page* 537.

It may fairly be inferred from the record that when the plaintiff appeared in the Court of Chancery with her own counsel and agreed to the dismissal of the proceeding and the property settlement with her husband, she was fully aware that her husband contemplated an immediate Nevada divorce. Indeed his departure for Nevada was within three days and shortly thereafter she received Mr. Souter's letter enclosing the power of attorney. While Mr. Souter's letter suggested that she designate Mr. Johnson, it also clearly told her that she was free to designate any other attorney, that if she desired seriously to contest any action by her husband for divorce in Nevada she should disregard the letter and that, in any event, she should take the power of attorney to competent counsel and be advised by him. There is no suggestion in the record or briefs before us that there was any unfairness or imposition in connection with the power of attorney and she admittedly signed it, had it notarized in New York, conferred with her son and with her nephew, who also notarized it, and arranged for its mailing to Nevada. On the following day she received the $50,000. Thereafter she knowingly permitted the Nevada action to proceed without interruption and kept for herself the sum aforementioned as well as the assets she received under the property settlement. She took no steps whatever towards setting aside the Nevada divorce until almost 4½ years had elapsed when

she filed her present complaint attacking the divorce but at the same time retaining the benefits from the $50,000 payment as well as the later $25,000 payment for the conveyance of her interest in the Weehawken and Union City premises. Under the circumstances it appears to us that, apart from the compulsion of the full faith and credit clause, her plea that the Nevada divorce be declared invalid may well be denied because of equitable considerations.

While we agree with the defendant that the Nevada divorce is not vulnerable to the plaintiff's attack here, we disagree with his contention that the agreement of July 22, 1953 merged into and did not survive the divorce decree. Nothing in the evidence presented to the trial court indicated that the parties intended any such merger (see *Flicker v. Chenitz*, 55 *N. J. Super.* 273, 291 *(App. Div.* 1959), certification granted 30 *N. J.* 152 (1959), appeal dismissed by consent 30 *N. J.* 566 (1959)); on the contrary it may fairly be inferred from the evidence that the agreement was made with an immediate Nevada divorce in mind and its provisions relating to continued maintenance of the properties and support of the wife were undoubtedly intended to remain in effect notwithstanding the divorce—otherwise they would have terminated in the short period required for the divorce and would have been of little value to the wife. In this connection, it is worthy of note that the formal order, which bore the consent of counsel for both parties and expressly referred to the settlement of July 22, 1953 and dismissed the Chancery proceeding, was not entered until after the Nevada decree. *Cf. Mayhew v. Chapman*, 116 *N. J. Eq.* 254 *(Ch.* 1934), affirmed 117 *N. J. Eq.* 27 *(E. & A.* 1934).

The defendant has at no time suggested and does not now contend that the $50,000 payment by him to his wife was intended to be in lieu of the provisions for continued maintenance of the properties and support of his wife and we are therefore not concerned with that issue. Nor are we strictly concerned with the concept of divisible *ex parte* Nevada divorces (see *Estin v. Estin, supra; cf. Vanderbilt v. Van-*

*derbilt,* 354 *U. S.* 416, 77 *S. Ct.* 1360, 1 *L. Ed. 2d* 1456 (1957)) or the effect of Nevada divorce decrees on earlier separate maintenance decrees. *Compare Lynn v. Lynn,* 302 *N. Y.* 193, 204, 97 *N. E. 2d* 748, 753, 28 *A. L. R. 2d* 1335 (1951) *with Isserman v. Isserman, supra.* See *Paulsen, "Support Rights and an Out-of-State Divorce,"* 38 *Minn. L. Rev.* 709 (1954); *Hartman, "Some Aspects of Divisible Divorce,"* 77 *N. J. L. J.* 105 (1954); *Note, "The Development of the Doctrine of Divisible Divorce,"* 1956 *Wash. U. L. Q.* 224. We are concerned here solely with the effect of a Nevada divorce decree (in which both spouses participated) on an earlier New Jersey settlement between the parties which was nowhere mentioned or dealt with in the Nevada proceeding. We are satisfied, as was the trial court, that the Nevada divorce decree was not intended to and did not terminate or otherwise affect the settlement of July 22, 1953. See *Hettich v. Hettich, supra; Coe v. Coe,* 145 *Me.* 71, 71 *A. 2d* 514 (*Sup. Jud. Ct.* 1950); *Walter v. Walter,* 129 *A. 2d* 253 (*Del. Ch.* 1957), affirmed 136 *A. 2d* 202 (*Del. Sup. Ct.* 1957); 1 *Nelson, Divorce* § 13.54, *p.* 538 (*2d ed.* 1945). *Cf. Equitable Life Assur. Society of United States v. Kretzschmar, supra; Dennison v. Dennison,* 98 *N. J. Eq.* 230, 240 (*Ch.* 1925), affirmed 99 *N. J. Eq.* 883 (*E. & A.* 1926); *Buttlar v. Buttlar,* 71 *N. J. Eq.* 671, 676 (*Ch.* 1906); *Herr, Marriage, Divorce and Separation,* 10 *N. J. Practice* § 489, *pp.* 501, 502 (*2d ed.* 1950).

In *Hettich v. Hettich, supra,* the New York Court of Appeals dealt with the effect of a Nevada decree upon an earlier settlement entered into by the parties in New York; in holding that the decree did not bar enforcement of the settlement, the court, after pointing out that the decree did not deal with alimony or support, stated that its entry alone was "insufficient to vary or modify the contractual obligation of the parties" and that it could not be said as a matter of law that "the Nevada decree represents a change in the status of the parties under the contract in suit or operates to relieve defendant of his contractual obligations"; and

citing *Finley v. Finley*, 65 *Nev.* 113, 117, 189 *P. 2d* 334, 336, 196 *P. 2d* 766 (*Sup. Ct.* 1948), the court noted that the law of Nevada did not "appear to be otherwise." 105 *N. E. 2d*, at *page* 603. In *Coe v. Coe*, 145 *Me.* 71, 71 *A. 2d* 514 (1950), the Supreme Judicial Court of Maine dealt with the effect of the Nevada divorce which the United States Supreme Court had passed upon in *Coe v. Coe*, 334 *U .S.* 378, 68 *S. Ct.* 1094, 92 *L. Ed.* 1451, 1 *A. L. R. 2d* 1376 (1948). It held that the divorce did not preclude the plaintiff-wife from maintaining an action on a written support agreement which she had entered into with the defendant-husband. The court first pointed out that the contract contemplated a possible divorce and that although it was mentioned in the Nevada decree, "it was not changed in any manner by the decree, and did not lose its identity or force as an existing contract between the parties"; it then went on to say:

"Whether the Nevada Court could change the terms of the contract, or terminate the contract, are not the questions now before us. It did not and has not. The decree in no way nullifies or terminates the contract. The Nevada Court when it granted the divorce reserved no right to change, imposed no conditions, and ordered no alimony. On the contrary, it ordered the parties and each of them 'to comply with the terms thereof.' It is, therefore, not a decree with provision for alimony that is in issue, but the terms of a contract. There was no merger as claimed by the defendant and no order by the Nevada Court that prevents action on the contract. In fact, by the very terms of the Court's decree the contract itself determines the property and other financial rights of the parties." 71 *A. 2d*, at *page* 516.

See *Coxe v. Coxe*, 20 *Del. Ch.* 384, 178 *A.* 104 (1935).

The power of attorney, which was signed by the plaintiff and was filed in the Nevada proceeding, designated Mr. Johnson to act for her "in any suit for divorce that may be brought against me in the State of Nevada." No mention whatever was made of the New Jersey settlement agreement of July 22, 1953 and it may be doubted that it vested any authority in Mr. Johnson to appear for the plaintiff in Nevada on any issue relating to the agreement. If there

had been an attempt by the Nevada court to deal with the agreement, question could now be raised, as suggested by the Maine court in *Coe v. Coe, supra,* as to its power to do so, but the Nevada court made no such attempt and we are entirely satisfied that its divorce decree has no bearing on the meaning and continued effect of the agreement. We come therefore to the defendant's contention that even though the agreement remained in full force and effect it was in essence an agreement for alimony and was not subject to specific performance under the line of cases in the Court of Errors and Appeals beginning with *Apfelbaum v. Apfelbaum,* 111 *N. J. Eq.* 529 (*E. & A.* 1932) and ending with *Harrington v. Harrington,* 142 *N. J. Eq.* 684 (*E. & A.* 1948). See also *Peff v. Peff,* 2 *N. J.* 513, 526 (1949); *Raymond v. Raymond,* 39 *N. J. Super.* 24, 30 (*Ch. Div.* 1956); but *cf. Flicker v. Chenitz, supra; Macfadden v. Macfadden,* 46 *N. J. Super.* 242 (*Ch. Div.* 1957), affirmed 49 *N. J. Super.* 356 (*App. Div.* 1958), certification denied 27 *N. J.* 155 (1958).

The inherent power of courts of equity to grant specific performance of husband-wife agreements dealing with support and related matters is clearly recognized in England and in the other states in our country as well as in the earlier decisions in our own State. See *Calame v. Calame,* 25 *N. J. Eq.* 548, 551 (*E. & A.* 1874); *Aspinwall v. Aspinwall,* 49 *N. J. Eq.* 302, 303 (*E. & A.* 1892); *Buttlar v. Buttlar,* 57 *N. J. Eq.* 645, 652 (*E. & A.* 1899); *Buttlar v. Buttlar, supra,* 71 *N. J. Eq.* 671; *Halstead v. Halstead,* 74 *N. J. Eq.* 596, 598 (*Ch.* 1908); *Dennison v. Dennison, supra; cf. Cohen v. Cohen,* 121 *N. J. Eq.* 299 (*Ch.* 1936); *Harrington v. Harrington,* 141 *N. J. Eq.* 456 (*Ch.* 1948), modified 142 *N. J. Eq.* 684 (*E. & A.* 1948); *Herr, supra,* § 493, *p.* 504; Annotation, *Specific performance, or other equitable enforcement, of agreement for wife's support or alimony,* 154 *A. L. R.* 323, 338 (1945); Annotation, *Specific performance of provisions of separation agreement other than those for support or alimony,* 44 *A. L. R. 2d* 1091, 1097 (1955).

In *Calame* (25 *N. J. Eq.* 548) the wife instituted an action for divorce in the Court of Chancery. The parties had entered into an agreement which provided for the transfer of real property to the wife and the payment to her of a sum in gross. The Court of Chancery adopted the terms of the agreement and directed its performance stating that it was acting under the statutory provisions relating to alimony. 24 *N. J. Eq.* 440, at *page* 444. See *N. J. S.* 2*A*:34–23. On appeal, the Court of Errors and Appeals pointed out that although in its opinion the statutory provisions applied only to periodic alimony payments "of the character of an annuity," it considered that Chancery had inherent equitable power to enforce the agreement so long as it was fair and just. In *Aspinwall* (49 *N. J. Eq.* 302) the husband and wife entered into a separation agreement which provided that the husband would permit his wife to live apart from him without molestation and that he would pay her the sum of $8 per week; the wife brought an action in the Court of Chancery for specific performance of the agreement and obtained a decree in her favor. The Court of Errors and Appeals held that the provision for the support of the wife could be regarded "as enforceable in a court of equity in this state" but that the provision relating to their living apart could not be specifically enforced since that would be contrary to public policy. In *Buttlar* (57 *N. J. Eq.* 645) the wife sued to recover moneys then due her under a separation agreement with her husband; the Court of Errors and Appeals held that she was entitled to prevail, citing *Aspinwall* in support of its understanding that agreements "to pay money for a wife's support have always been regarded as enforceable in a court of equity in this state."

In *Buttlar v. Buttlar, supra,* 71 *N. J. Eq.* 671 (*Ch.* 1906), Vice Chancellor Garrison specifically enforced the support agreement between the parties which had been entered into while they were husband and wife; they were later divorced but the Vice Chancellor held that the divorce had not deprived her of "her vested rights" under the agreement. In

the course of his opinion he referred to the established doctrine that agreements between husband and wife may be enforced in equity "if fair and fairly obtained" and he indicated that the husband would be entitled to assert any equities he might have by way of defense because of changed circumstances or otherwise. See *Flicker v. Chenitz, supra,* 55 *N. J. Super.,* at *page* 292. In *Halstead v. Halstead, supra,* the same Vice Chancellor again noted that a husband-wife agreement for support would be enforced by a court of equity "to the extent that it finds that the engagement was equitable and just." In *Dennison v. Dennison, supra,* the parties entered into an agreement for the payment by the husband to his wife of $25,000 over a period of years, in lieu of alimony and counsel fees. Thereafter one of the charges was withdrawn from their divorce action which was pending in Pennsylvania and a decree was entered there without opposition. The wife sought specific performance of the agreement and Vice Chancellor Berry held that she was entitled to prevail. In the course of his opinion he referred to the fact that New Jersey's divorce statute vested express power in the Court of Chancery to order support and maintenance and to make such further orders from time to time "touching the same as shall be just and equitable"; that agreements respecting support and maintenance or alimony settlements had always been held subject to "approval or modification" by the court; and that "no such agreements, unless fair, equitable and just, will be approved or enforced." However, he then went on to say that when couched in terms meeting with the court's approval, such agreements had been uniformly enforced, citing various cases including *Calame v. Calame, supra, Buttlar v. Buttlar, supra,* and *Halstead v. Halstead, supra.* In affirming, without dissent, the Court of Errors and Appeals adopted the opinion of the Vice Chancellor. 99 *N. J. Eq.,* at *page* 883. See *Whittle v. Schlemm,* 94 *N. J. L.* 112 (*E. & A.* 1920); *Corrigan v. Corrigan,* 115 *N. J. Eq.* 49 (*Ch.* 1933).

When the Court of Errors and Appeals handed down its opinion in *Apfelbaum v. Apfelbaum, supra,* the first in the controversial line of cases which failed to give recognition to the inherent power of the Court of Chancery to grant specific performance of "fair and fairly obtained" husband-wife support agreements, it did not discuss *Calame, Aspinwall* or any of the other aforecited New Jersey decisions. Indeed its opinion was a short *per curiam* which merely cited *Calame* in connection with the statement that New Jersey's divorce statute grants power to deal with alimony before and after divorce and that this statutory power includes authority "to regulate the amount of such alimony from time to time, to supervise agreements between the parties in that regard, to enforce them if deemed just, and to decline to recognize them otherwise." But the court did not at any point indicate why the statutory power (*N. J. S.* 2A:34–23) should be considered as having terminated Chancery's pre-existing equitable jurisdiction to grant relief where the wife does not seek any exercise of the statutory power (see *Rennie v. Rennie,* 85 *N. J. Eq.* 1, 3 (*Ch.* 1915); cf. *O'Loughlin v. O'Loughlin,* 12 *N. J.* 222, 230 (1953)) but seeks enforcement of a support agreement with her husband to the extent that it is just and equitable. Passing any suggestion of lack of constitutional authority to do so (see *Harrington v. Harrington, supra,* 141 *N. J. Eq.,* at *page* 466), there is nothing in the statute which evidences any legislative purpose to withdraw the court's equitable powers, and insofar as the policy of having broad judicial control of alimony is concerned, that policy may readily receive full recognition in the course of the court's enlightened exercise of its traditional specific performance jurisdiction. See *Flicker v. Chenitz, supra,* 55 *N. J. Super.,* at *page* 292; *Buttlar v. Buttlar, supra,* 71 *N. J. Eq.,* at *page* 676; 5 *Corbin, Contracts* § 1137, *pp.* 612, 618 (1951); but *cf. Moller v. Moller,* 121 *N. J. Eq.* 175, 178 (*Ch.* 1936).

In the *Flicker* case, *supra,* a property settlement agreement between husband and wife was entered into while a divorce

proceeding between them was pending. The agreement provided, *inter alia,* that the husband would pay the wife $140 a week in lieu of alimony and it was approved as fair and equitable in the divorce decree which was entered later in the Court of Chancery. After the death of the husband, the wife instituted her action in the Chancery Division against the husband's executors seeking construction and specific performance of the agreement; the Appellate Division granted the relief she sought and in the course of its opinion had this to say with respect to the court's power to exercise continued supervisory control:

"As we noted above, the public policy of this State requires that orders touching the support of a wife be subject to modification upon changes in the circumstances of the parties. Therefore the decree of specific performance which will issue under the mandate to follow this opinion will provide that the wife or the estate of the husband may apply to the court for modification of the decree if there is a material change of circumstances, such as the emancipation of the children or the remarriage of the wife. See *Restatement, Contracts,* § 359(2), *p.* 638, and 5 *Williston, Contracts* (*rev. ed.* 1937), § 1425, *p.* 3993, for the power of a court to award specific performance on such terms and conditions as justice requires, even to the extent that the performance ordered is not identical with that promised in the agreement. See also *King v. Ruckman,* 24 *N. J. Eq.* 556, 565 (*E. & A.* 1873); 5 *Corbin on Contracts* (1951), § 1137, *p.* 612, text at *n.* 12. *Cf. Ferreira v. Lyons,* 53 *N. J. Super.* 84, 89 (*Ch. Div.* 1958)." 55 *N. J. Super.,* at *pages* 292–293.

See *Behr v. Hurwitz,* 90 *N. J. Eq.* 110, 116–117 (*Ch.* 1918); 5 *Williston, Contracts,* § 1425, *pp.* 3989–3993 (*rev. ed.* 1937).

█ In *Macfadden v. Macfadden, supra,* the husband and wife entered into a separation agreement which provided that the husband would supply his wife with a home during her lifetime. In accordance with the agreement the wife discontinued an action she had instituted in New York and she surrendered certain claims against her husband. Thereafter he obtained a Florida divorce and later died. His wife filed an action in the Chancery Division of the Superior Court against her husband's executors seeking

specific performance of the agreement; the Chancery Division granted the relief she sought and its action was affirmed by the Appellate Division in an opinion which sought to differentiate the line of cases in the Court of Errors and Appeals commencing with *Apfelbaum*. The Appellate Division expressed the view that those cases dealt exclusively with agreements for the payment of alimony whereas the agreement before it was "not one solely for alimony" and it relied on the many New Jersey authorities which had theretofore enforced husband-wife agreements to the extent that they were equitable and fair. Others have similarly sought to distinguish *Apfelbaum* on narrow factual and procedural points which are not very meaningful. See *Cohen v. Cohen, supra,* 121 *N. J. Eq.,* at *page* 299; *Harrington v. Harrington, supra,* 141 *N. J. Eq.,* at *page* 456; *Annotation, supra,* 154 *A. L. R.,* at *page* 338. It seems to us that such tenuous differentiations should assiduously be avoided since they merely serve to becloud rather than clarify the just principles and purposes of the law. *Apfelbaum* (and the cases which followed it) broadly intended to withdraw from Chancery the equitable power to grant specific performance of support agreements in the belief that the statutory provisions relating to alimony were more flexible and should be dealt with as exclusive. *Cf. Herr, supra,* § 493, *p.* 506. But, as we have already indicated, such belief failed to take into account the highly flexible nature of Chancery's specific performance jurisdiction and its earlier application by the New Jersey courts in the enforcement of husband-wife support agreements to the extent that they were just and equitable. We are satisfied that the restrictive approach in *Apfelbaum* was an unnecessary departure from fundamental principles of equitable jurisdiction, was not dictated by any sound reason or any statutory policy, and does not effectively serve the interests of justice; it may now be considered as discarded in favor of the view that, apart from its statutory authority, the Superior Court has power to direct the specific performance of the terms of husband-wife support agree-

ments to the extent that they are just and equitable. See *Flicker v. Chenitz, supra; Macfadden v. Macfadden, supra; cf. Calame v. Calame, supra; Aspinwall v. Aspinwall, supra; Clapp, Marital Separation Agreements,* 59 *N. J. L. J.* 105 (1936).

The defendant urges that even though husband-wife support agreements are generally considered the proper subject of specific performance, the particular agreement in the instant matter was merely an understanding preliminary to the execution of a formal contract and lacked the essential elements of a binding agreement. He stresses the fact that the length of time was not specified, that nothing was said as to what would happen if the wife remarried or became unchaste, that nothing was said as to whether it would survive a divorce, and that no specified amount of weekly, monthly or annual support was stated. The trial court, after considering the testimony offered on behalf of both parties, found that there was a binding agreement on July 22, 1953 which was "fair and just" and in "full force and effect" and we see no reason for disturbing its finding. The settlement agreement was a deliberate stipulation made in open court in the presence of both parties and their counsel; it was the reason the wife consented to a dismissal of her Chancery proceeding and to the waiver of her rights to the personal property and contents in the house at Columbia Terrace, Weehawken; and it was set forth as the basis of the formal order of dismissal which was not entered until after the entry of the Nevada divorce decree. *Cf. Gelsmine v. Vignale,* 11 *N. J. Super.* 481, 485 (*App. Div.* 1951). The deliberate stipulation in open court was a proper one, was based on adequate consideration, was participated in by both parties and their counsel, and was at least as binding as a privately executed written contract between them. See *Carlsen v. Carlsen,* 49 *N. J. Super.* 130, 136 (*App. Div.* 1958).

Although the terms of the stipulation were expressed in general fashion they were sufficient, when considered in

the light of all of the evidence, to enable the trial court to define them with assurance that the intentions of the parties were being fulfilled. See *Fountain v. Fountain,* 9 *N. J.* 558, 565 (1952) ; *cf.* 1 *Corbin, supra,* § 95, *p.* 290. The omission of any provision as to length is immaterial for it is evident that the parties intended that it remain in force at least while, as here, both parties remained alive (*cf. Flicker v. Chenitz, supra*) ; the omission of any provision as to what would happen if the wife remarried or became unchaste is immaterial for there is no suggestion that that has occurred (see *Herr, supra,* § 488, *p.* 499 ; *cf. Flicker v. Chenitz, supra,* 55 *N. J. Super.,* at *page* 292; *N. J. S.* 2A:34–25) ; the omission of any express provision as to survival after divorce is immaterial in view of our conclusion, hereinbefore expressed, that the parties clearly contemplated such survival; and the omission of any specified amount of weekly, monthly or annual support for the wife is immaterial in view of the trial court's finding, amply supported by the evidence, that the payment of $100 per week would fulfill the defendant's agreement to provide for his wife "in the same manner and to the same degree" as he had theretofore provided for her. See *Fountain v. Fountain, supra.* Although the judgment of the trial court directed not only payment of arrearages but also payments in the future as contemplated by the agreement (*cf. Mockridge v. Mockridge,* 62 *N. J. Eq.* 570 (*Ch.* 1901)), the defendant has made no point of this and has not raised any question as to the power to do so upon this court's general recognition of the trial court's equitable specific performance jurisdiction; accordingly we shall not discuss the issue except to point out that no persuasive reason for denying the power has ever come to our attention. See *Fleming v. Peterson,* 167 *Ill.* 465, 47 *N. E.* 755 (*Sup. Ct.* 1897) ; *cf. Corrigan v. Corrigan, supra; Morton v. Morton,* 131 *A.* 2d 185 (*Del. Ch.* 1957) ; *Buswell v. Buswell,* 377 *Pa.* 487, 105 *A.* 2d 608, 44 *A. L. R.* 2d 1085 (*Sup. Ct.* 1954) ; *Peters v. Peters,* 20 *Del. Ch.* 28, 169 *A.* 298 (1933) ;

584

*Adams v. Adams*, 32 *Pa. Super.* 353 (*Super. Ct.* 1907); *Guth v. Guth* [1792] 3 *Bro. Ch.* 614, 29 *Eng. Rep.* 729.

■ While the plaintiff, of course, strongly supports the view that the agreement of July 22, 1953 was specifically enforceable, she nevertheless contends that the trial court's failure to grant her an allowance for capital improvements, repairs and furniture in the Sea Girt property was erroneous. The evidence disclosed that after the property was transferred to the plaintiff she made very extensive alterations, including the remodeling of a kitchen, the installation of a bathroom and the addition of a garage. These alterations were made to enable her to rent the main house while she lived elsewhere on the property. She stated that she spent almost $25,000 for capital improvements and over $8,000 for furniture and appliances. The trial court rightly stressed that the defendant had no interest in the Sea Girt property and that the plaintiff's expenditures were exclusively for her own financial benefit; it entertained the view that the July 22nd agreement did not envision that the defendant would be chargeable for such capital improvements or furniture and since the evidence indicated to it that the line between repairs and capital improvements was indistinct and the dangers of abuse were great, it determined that the plaintiff's aggregate claim for allowance of capital improvements, repairs and furniture should, in all justice, be denied. The grant of relief within its specific performance jurisdiction involved a careful and measured exercise of discretion and judgment by the trial court and we are unable to say that its ultimate disposition of the entire matter failed to achieve "complete justice" (*cf. Fountain v. Fountain, supra*) or that it did not substantially fulfill the reasonable expectations of the parties to the settlement agreement; accordingly we shall not disturb it.

■ The final issue relates to the allowance of a counsel fee to the plaintiff's attorney. We readily reject the defendant's contention that the matter was not a matrimonial one within the provisions of *R. R.* 4:55-7(*a*) and *R. R.* 4:93-2(*a*).

See *Isserman v. Isserman, supra,* 11 *N. J.,* at *page* 115; *Nappe v. Nappe, supra,* 20 *N. J.,* at *page* 350. And we are satisfied that in the light of the evidence, including that relating to the financial status of the parties and the manner and extent of the presentation of the manifold issues, the amount of the allowance may be considered to be within the broad limits of the trial court's discretionary authority. See *Grunstra v. New-Ark Petroleum Corp.,* 111 *N. J. Eq.* 451, 453 (*E. & A.* 1932); *Armour v. Armour,* 138 *N. J. Eq.* 145, 162 (*E. & A.* 1946); *cf. Cole v. Cole,* 30 *N. J. Super.* 433, 439 (*Ch. Div.* 1954).

Affirmed.

FRANCIS, J. (dissenting in part). For many years the law has been that the State is a third party, in fact if not in name, in every divorce action. Its interest arises from a recognition that the family relation is essential to the fabric of our society. To sanction the destruction of marriage when it is accomplished by sickening sham is to ignore a malignancy eating at the vitals of our country. The State is present in proceedings for the dissolution of a marriage, or in actions like the present one questioning the validity of a foreign divorce judgment through the person of the court; not just the physical presence but, as Mr. Justice Brennan said, "by the conscience of the court." *In re Backes,* 16 *N. J.* 430, 434 (1954); and see, *Kress v. Kress,* 1 *N. J.* 257 (1949); *Sheehan v. Sheehan,* 22 *N. J. Super.* 326 (*App. Div.* 1952); *Welch v. Welch,* 35 *N. J. Super.* 255 (*App. Div.* 1955); *Pisciotta v. Buccino,* 22 *N. J. Super.* 114 (*App. Div.* 1952); *Duerner v. Duerner,* 142 *N. J. Eq.* 759 (*E. & A.* 1948); *Feickert v. Feickert,* 98 *N. J. Eq.* 444 (*Ch.* 1926); *N. J. S. A.* 2:50–17; *Nelson, Divorce and Annulment* (2d ed. 1945) § 1.07. So grave is the judicial obligation that its satisfaction requires "that all proper defenses be made or compelled." *Giresi v. Giresi,* 137 *N. J. Eq.* 336, 341 (*E. & A.* 1945). In my judgment, our duty can be performed here only by denying validity to the Nevada judgment.

The trial court found that defendant's divorce was procured by fraud. Under the proof any other conclusion is impossible. Schlemm bought and paid for the dissolution of his marriage; the price was $50,000. That price is out of the reach of many persons but, under the law as it is now clearly recognized by the majority opinion, formal consent to a divorce is the only payment necessary.

On July 25, 1953, three days after the wife's separate maintenance action in this State was settled, but before the support and property division agreement was formalized by a writing, the husband arrived in Reno, Nevada. On July 30 what is undoubtedly the appropriate form letter used in these cases was dispatched to the wife by Nevada counsel, Clyde D. Souter, Esq. It advised that her husband "has been residing in Reno for some time past" and that a divorce action was to be instituted. Enclosed was a power of attorney to be signed by Mrs. Schlemm if she had no objection to submitting to the jurisdiction of the Nevada court. Kendrick Johnson, Esq., of Reno, was named therein as the attorney to appear for her, although it was suggested that she was free to nominate some other person. (In this connection, it is interesting to note that in *Nappe v. Nappe,* 20 *N. J.* 337 (1956), *Isserman v. Isserman,* 2 *N. J.* 1 (1949), and *Roskein v. Roskein,* 25 *N. J. Super.* 415 (*Ch. Div.* 1953), involving similar situations, the same two attorneys appeared for the parties.) The document was signed and returned, and the following day Mrs. Schlemm received the $50,000 payment.

It is obvious from the record that the sole purpose of the power of attorney was to aid the husband's cause and to protect his interest. Mr. Johnson was authorized by the wife to act in the divorce action and "to answer or otherwise plead to the complaint * * * as in [his] judgment may be best and as fully to all intents and purposes as I could do if I were present personally." The answer filed thereafter, containing among other things a formal denial of the *bona fide* residence of the husband, was manifestly de-

signed to assist in the establishment of the fact of jurisdiction of the Nevada court rather than to contest it. The cross-examination of the husband consisted of nine questions put by Mrs. Schlemm's ostensible attorney. Cross-examination is a device long honored in our trial process as a means of ferreting out the truth. In this instance, the only purpose served by the type of questions asked was to support an untruth. But, more important, Mr. Johnson never communicated with the wife in New Jersey at any time after receiving the power of attorney. He made no inquiry of her as to whether she wished to claim alimony or support, and he engaged in no effort to protect or advance her interests in that respect at the hearing. He made no attempt to incorporate in the final judgment the maintenance agreement which had been made orally in this State. So far as the record shows, no consideration was given to the issue of whether the divorce imperiled the New Jersey unformalized support settlement.

The testimony in the present matter, as well as the conduct of Schlemm from the consent dismissal of the New Jersey maintenance suit throughout the course of the Nevada action, indicates that he had no intention of abiding by the local support compact. In fact, the only reasonable conclusion to be drawn is that, for the purpose of wiping out any support claim she might have, he fraudulently induced her to appear in the Nevada proceedings by an attorney selected by his agent. Throughout this case he has contended that the New Jersey "understanding" did not constitute a binding agreement; that in any event under our law it is not an enforceable contract; that it did not survive the Nevada divorce; and that, since the Nevada judgment was entitled to full faith and credit, New Jersey could not constitutionally enforce any such agreement. To me the following conclusions are unavoidable. Mrs. Schlemm's consent to appear was obtained, at least in part, by fraud. The divorce proceedings were collusive and not truly adversary, and finally, Schlemm did not establish a *bona fide* resi-

dence in Nevada. In short, the foreign judgment is so infected with fraud that the full faith and credit clause cannot invest it with any lawful dignity. The principles of the *Sherrer* and *Coe* cases, referred to in the opinion of the majority, do not in my judgment give constitutional vitality to a judgment so tainted by the fraud of the husband upon the courts of two states and upon his wife. *Nappe v. Nappe*, 20 *N. J.* 337, dissent at *page* 357 (1956); *Staedler v. Staedler*, 6 *N. J.* 380, 390 (1951); and see, *Isserman v. Isserman*, 2 *N. J.* 1, 9 (1949).

I believe we must test the issue of fraud in cases such as this with a more sensitive measuring rod. A technical doctrinal approach for the asserted purpose of giving finality and security to a few transactions, usually involving property, fills a small hole in the dike and ignores the flood which is sweeping over the top.

In recent years, divorces in the country have totaled almost 400,000 annually; more than 1,000 every day. [1957—381,000 estimated, *Annual Report, U. S. Department of Health, Education and Welfare*, 85; 1956—382,000, *Jacobson, "American Marriage and Divorce"* (Rinehart & Company, Inc., New York, 1959), 90.] Current figures do not appear to be available to indicate the number of minor children involved, but for 1955, with 377,000 divorces and annulments, there were about 343,000 such children. These children were concentrated in 47% of the couples involved; 53% of them had no children. *"American Marriage and Divorce," supra* 129. In 1953 there were 390,000 divorces involving an estimated 330,000 children, and in 1954, 379,000 divorces with 341,000 children. *Vital Statistics–Special Reports, U. S. Department of Health, Education and Welfare, Volume* 44, *p.* 140 (1956). The number of broken homes with children under 18 has increased from 1.5 million in 1950 to 2.8 million in 1956, and juvenile court delinquency cases more than doubled between 1948 and 1956, with a further large increase indicated for 1957. *Annual Report, supra* 55. A study made a few years ago by rep-

resentatives of the Department of Institutions and Agencies revealed that in 1950 in New Jersey there were 55,000 divorced persons, more than twice the 1940 figure. In that year, 54% of the divorces involved minor children, 78% of whom were under 15 years of age. These minor children represented 12% of all the children in the State. But the real tragedy was that 29% of all the delinquent children came from that group. No later study appears to have been made.

In the face of this distressing factual and practical situation, I cannot believe that the "strength of our democracy" rests in any way upon the enforcement of fraudulent and collusive divorce judgments of the type here in question. The interests of the State are subverted by what is plainly an acceptance of divorce by consent, particularly where the consent is procured, at least in part, by fraud. Unless the decisions of the highest tribunal of our country leave us no choice, we should not become aiders and abettors of the migratory divorce business. Characterization of the activity as a business is not inapt. Study of the reaction of Nevada to attempted competition shows that the practices of the supermarket have been pursued to retain control of the industry. *"American Marriage and Divorce,"* supra 103–104. As a result, that state undoubtedly has the highest divorce rate in the country. See *Report of the Joint Legislative Committee* [of New York] *on Matrimonial and Family Laws* (1957) 51.

The language of Justice Frankfurter, in his dissent in *Sherrer v. Sherrer,* 334 *U. S.* 343, 359, 68 *S. Ct.* 1087, 1097, 1098, 92 *L. Ed.* 1429, 1440, 1 *A. L. R. 2d* 1355, 1366 (1948), ought to be the prevailing sentiment on the facts of this case. He said:

"I cannot agree that the Constitution forbids a state from insisting that it is not bound by any such proceedings in a distant State wanting in the power that domicile alone gives, and that its courts need not honor such an intrinsically sham proceeding, *no matter who brings the issue to their attention.*

That society has a vital interest in the domestic relations of its members will be almost impatiently conceded. But it is not enough to pay lip-service to the commonplace as an abstraction. Its implications must be respected. They define our problems. Nowhere in the United States, not even in the States which grant divorces most freely, may a husband and wife rescind their marriage at will as they might a commercial contract. Even if one thought that such a view of marriage was socially desirable, it could scarcely be held that such a personal view was incorporated into the Constitution or into the law for the enforcement of the Full Faith and Credit Clause, enacted by the First Congress. * * * That when the Constitution was ordained divorce was a matter of the deepest public concern, rather than deemed a personal dispute between private parties, is shown by the fact that it could be secured almost exclusively only by special enactments of the several legislatures and not through litigation in court. * * *

As a contract, the marriage contract is unique in the law. To assimilate it to an ordinary private contract can only mislead. * * * The parties to a marriage do not comprehend between them all the interests that the relation contains. Society sanctions the institution and creates and enforces its benefits and duties. As a matter of law, society is represented by the permanent home State of the parties, in other words, that of their domicile. * * *" (Emphasis added)

By the ruling in this case, the court has done what even Nevada would not do. With full knowledge that the divorce was procured by consent, that the jurisdiction of the Nevada court was based on a fraudulent residence, and in the face of an unavoidable conclusion that the husband imposed upon his wife in securing her signature on the power of attorney so that he could defeat, or attempt to defeat, the support agreement he had just made in New Jersey, it has accepted the divorce as valid. I do not believe that the United States Supreme Court decisions, which are said to command such a course, in fact require it. If they do, the state courts, of course, must bow. But in that event the marriage contract will have lost much of its vitality and much of its sanctity, for it may be dissolved at the whim of the parties.

For the reasons stated, the divorce judgment should be declared void in New Jersey. As to the enforceability of

the support agreement made in this State, I concur completely in the opinion of the majority.

*For affirmance*—Chief Justice Weintraub, and Justices Burling, Jacobs, Proctor and Schettino—5.

*For modification*—Justice Francis.