75 N.J. Super. 319 (1962)
183 A.2d 137
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
WALTER L. EVANS, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued March 19, 1962.
Decided July 6, 1962.
*320 Before Judges PRICE, SULLIVAN and LEWIS.
*321 Mr. Leslie Kohn argued the cause for appellant (Mr. John Romanition, assigned counsel).
Mr. Peter Murray, Assistant Prosecutor, argued the cause for respondent (Mr. Brendan T. Byrne, County Prosecutor of Essex County, attorney; Mr. Murray, on the brief).
The opinion of the court was delivered by LEWIS, J.A.D.
Defendant Walter Evans was convicted July 14, 1960 of the possession of narcotic drugs, heroin and marijuana, in violation of R.S. 24:18-4. He was sentenced to State Prison for a term of five to seven years. On appeal to this court defendant invokes the doctrine of Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, decided June 19, 1961 (overruling Wolf v. Colorado, infra), and argues that it is retrospective in its application and, accordingly, the court committed "plain error" when it admitted evidence which the State had seized as the result of an illegal search. The prosecution contends that the exclusionary rule now applicable to the states, as enunciated in Mapp, only functions prospectively. At the time of oral argument there was then pending before our State Supreme Court, not argued, the case of State v. Smith, in which similar legal issues were raised. Smith has now been decided, 37 N.J. 481 (1962). However, under the facts and circumstances of that case, the search and seizure there involved was deemed reasonable and the evidence questioned therein was held to have been properly admitted. The court determined that "an offense was committed in the `presence' of the arresting officers."
In the case sub judice there are distinguishable, crucial facts. On July 27, 1959, at approximately 10 A.M., Detectives Carter Saunders and Robert Gingrich of the Newark Narcotic Squad, as a result of "information" received concerning the sale of narcotic drugs at premises 18 Rutgers Street, Newark, had said premises under surveillance. After the lapse of approximately an hour, during *322 which time "they observed nothing," Saunders telephoned the defendant at that address. He obtained the number from the Newark telephone directory, and asked the woman who answered the phone for "Walter." Saunders made arrangements with the man who came to the phone to meet him at the corner of West Market and Norfolk Streets, Newark. Twenty minutes later Walter Evans "came down the street and stood on the corner." Saunders approached defendant and engaged him in a conversation about a job on a truck and then left to join Gingrich, who was a short distance away. The detectives observed defendant as he proceeded toward Rutgers Street and, when he reversed his direction to cross the street, he was accosted by Gingrich, who testified:
"I grabbed both his hands and steered him into a hallway there. I told him we were Newark police and I accused him of being a dealer in narcotics and of living at 18 Rutgers Street. He denied both. He had in his hand a set of keys, which I had a struggle to take from his hand at that time. * * * I told him we were taking him back to 18 Rutgers Street. He said he didn't live there, he had never been there and he was going to his mother's house on New Street."
This episode of the "keys" was corroborated by Saunders, who said:
"We took him back to 18 Rutgers Street. When we got to the hallway he had a set of keys in his hand. My partner asked him for the keys. He didn't give them to him, so my partner took them and went to the rear and fitted the key into a door. * * * About the time we opened the door a girl came to the front door  the door that we just opened  partially clad, and wanted to know what this was all about. Walter Evans told her we were the police. We went into the inner apartment, to a bedroom."
The "girl" in the apartment at that time was Terry Greco, and she testified:
"* * * I heard someone calling me in the hall, `Terry.' So I went to the door. Just as I was getting to the door I heard a *323 key in the door and the door was opened and I saw a white gentleman open the door, and he came in and he told me to remain where I was or to go in the bedroom. Then they presented themselves as police officers, and that is when they began to search."
Defendant, however, denied that he had any keys. His stated version, under direct examination, as to what then transpired was as follows:
"Q. Then you were taken into custody by whom?
A. Detective Gingrich.
Q. And at that time did you have any keys in your hand?
A. No, Detective Gingrich took me in the hallway and made me disrobe. He took my shoes, my clothes, and searched me.
BY THE COURT:
Q. When you say he made you disrobe, what do you mean?
A. He made me take off my shoes, my socks, and take my shirt out of my trousers, and my hat.
BY MISS CLAWANS:
Q. Now, did you have any keys in your hands or about your person?
A. I did not.
Q. Now, did you at any time have the key that belonged to the apartment on this particular day, to 18 Rutgers Street?
A. I have never had a key to 18 Rutgers Street.

* * * * * * * *
Q. When you got there, how did you get in?
A. The door was open."
Upon entering the premises, the detectives conducted an exploratory search. Gingrich found a leatherette kit containing a bottle cap, a silk stocking, two decks of heroin and hypodermic needles on a chair in the bedroom. Saunders testified that these items were "used for the administration of a so-called `fix.'" Two other detectives were summoned who helped to search the apartment; one of them discovered a bag containing marijuana in a bureau drawer in the bedroom. The credible evidence amply established that defendant lived, at least on occasions, at 18 Rutgers Street, Newark, and that the contraband drugs and paraphernalia belonged to him. The fact that he also may *324 have rented an apartment in New York does not disprove his connection with the New Jersey address.
Defendant, having steadfastly denied that he had possession of any keys to 18 Rutgers Street, cannot now on appeal be heard to complain that he was forcibly compelled to relinquish possession thereof to the detectives. The fact, however, that Evans disclaimed any interest in the premises searched and in the criminal evidence per se, i.e., the heroin, marijuana and narcotic paraphernalia therein seized, does not deprive him of the right to assert, in a "possessory" criminal proceeding, an invasion of his constitutional privilege of privacy and security of property. Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).
Chief Justice Weintraub, in writing a unanimous opinion in Smith, declared that the "precise contours of Mapp are as yet unclear," and then proceeded to advert to some of the problems presented by its impact "to the end that the bench and bar may consider them in this new area of litigation." In that erudite decision there is an extensive review and analysis of Mapp and the legal perplexities it engenders and its retrospective aspects; also of numerous federal as well as state cases dealing with the rationale of the rule of exclusion as a deterrent to official misconduct, which authorities need not be here discussed. Suffice it that we note certain guiding principles declared in Smith which are particularly significant for our consideration in the case at bar, viz: (1) evidence obtained by a search and seizure in violation of the Fourth Amendment of the United States Constitution is inadmissible in a state court as it is in a federal court; (2) while the application of Mapp is essentially prospective, it is not necessarily inapplicable merely because the search antedated it; (3) its retrospective effect, however, is circumscribed by potential limits and is subordinate to "essential justice both to the individual and to the community"; (4) the defense at a pre-Mapp trial should not on a direct appeal be charged with the failure *325 to anticipate that decision and its effect upon the admissibility of evidence; (5) a search is reasonable if conducted incident to a lawful arrest; and (6) Mapp sought to put an end to "official lawlessness" and "flagrant" disregard for the basic rights of an accused under the Fourth Amendment guarantee. "Hence it may be that, as to the States, the rule of exclusion will be confined to situations in which bad faith or indifference to the constitutional right is palpable."
Applying these concepts we hold that defendant has timely raised a constitutional issue which should be considered on a direct appeal and that the record of his conviction is to be reviewed in the light of Mapp notwithstanding the predated trial. Unlike Smith, however, the facts of the instant case do not present a situation which demonstrates a clear case of a reasonable search and seizure. The record before us casts doubt upon its reasonableness. It appears that the circumstances may not have been emergent. Suspicious developments did not occur at the property while it was under surveillance. Nothing of an incriminating nature was revealed by the personal search of Evans. There was no proof of a criminal offense in the presence of the arresting officers nor any evidence prior to the entry into the apartment that a crime had taken place or was about to be committed. The proofs do not reveal whether or not a search warrant or a warrant for arrest had ever been issued. The actions of the detectives, as narrated by their testimony, may not have been "necessary for the successful enforcement of the State's rights." Their conduct may have been unjustified and may have constituted "insolence in office as distinguished from a good-faith failure to stay within the technical rules of search and seizure."
It does not necessarily follow that defendant's conviction is illegal. A pedantic and rigorous application of the exclusionary rule by this court, as a post-conviction remedy for an alleged constitutional error, would deprive the State of an opportunity to litigate fully the legality of the search *326 and seizure on the basis of all the facts. The State prosecuted Evans relying upon the non-exclusional practice sanctioned by Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949) (vide Broeder, "The Decline and Fall of Wolf v. Colorado," 41 Neb. L. Rev. 185 (1961)), and Eleuteri v. Richman, 26 N.J. 506 (1958), cert. denied 358 U.S. 843, 79 S.Ct. 52, 3 L.Ed.2d 77 (1958). In Eleuteri our Supreme Court recognized the freedom from unreasonable searches and seizures as guaranteed by our 1947 State Constitution (Art. I, par. VII) and the United States Constitution (Fourth Amendment) as "one of the great imperatives of a decent society" which "stands between the citizen and a police state." While the court in that case refused to suppress evidence obtained pursuant to a search warrant deemed illegal because it had been issued by a magistrate outside the territorial limits of his jurisdiction, it declared:
"* * * we find neither `dirty business' nor any need for the sanction of exclusion to discourage it. If events should indicate an appreciable disposition in our State to flout the guaranty, we would not hesitate to seek a solution." (26 N.J., at p. 516)
At the time of Evans' trial the State was not required to prove that the police had probable cause, since the law did not require such proof. The detectives knew the defendant's name in advance of their contact with him and they had his photograph for identification, but the existence of any other factual knowledge or the nature, extent and source of the "information" which they had received before going to 18 Rutgers Street are not revealed in the record. What reasonable grounds or cause, if any, the police had upon which to proceed as they did is not disclosed. The State should not under the circumstances be foreclosed of an opportunity to establish the propriety of the entry, the necessitous circumstances if such were the case, and the reasonableness of the protested search and seizure. It is not within our province as an appellate court to presume *327 that the police officials acted without probable cause, illegally entered the premises in question and consummated an unlawful search and seizure. A remand is in order as indicated by the opinion of our Supreme Court in State v. Scrotsky, 38 N.J. 14, decided June 29, 1962. Adopting the language of that opinion, this cause is remanded to the trial court so that the State and defendant may add such additional, relevant, clarifying evidence as they wish. Upon completion, the record should be returned to us with a finding by the trial court as to the validity of any search and seizure which produced evidence upon which defendant's conviction was predicated. Supplemental briefs may thereafter be filed in this court and the matter will be set down for reargument. Present assigned counsel will continue to represent defendant on the remand and on the reargument here. In the meantime we shall retain the appeal.
The remaining points raised on appeal are without substance. The verdict was not against the weight of the evidence, defendant was not placed in double jeopardy, the trial court properly ruled against admitting in evidence the proffered rent receipts, and the charge to the jury was free from reversible error.
Remanded as stated.