78 N.J. Super. 437 (1963)
189 A.2d 57
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
WALTER L. EVANS, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued December 3, 1962.
Decided January 25, 1963.
*438 Before Judges PRICE, SULLIVAN and LEWIS.
Mr. Leslie S. Kohn argued the cause for appellant (Mr. John Romanition, assigned counsel; Mr. Kohn, on the brief).
Mr. Peter Murray, Assistant Prosecutor, argued the cause for respondent (Mr. Brendan T. Byrne, County Prosecutor of Essex County, attorney; Mr. Murray, of counsel and on the brief).
The opinion of the court was delivered by LEWIS, J.A.D.
Defendant Walter Evans appealed to this court from a conviction (July 14, 1960) of possession of narcotic drugs, i.e., heroin and marijuana, in violation of R.S. 24:18-4. We heretofore determined that the verdict of defendant's guilt was not against the weight of the evidence and we resolved against him the issues on appeal respecting double jeopardy, the court's refusal to admit certain proffered evidence, and the allegations of reversible errors in the charge to the jury. See State v. Evans, 75 N.J. Super. 319 (App. Div. 1962).
Under the authority of Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), and Eleuteri v. Richman, 26 N.J. 506 (1958), cert. denied 358 U.S. 843, 79 S.Ct. 52, 3 L.Ed.2d 77 (1958), the State's evidence at the time of trial was admissible.
*439 On direct appeal, however, defendant invoked the doctrine of Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (decided June 19, 1961), claiming that the evidence relied upon by the prosecution was illegally seized and, therefore, its admission was "plain error" which warranted reversal of his conviction. Recognizing the pronouncement in State v. Smith, 37 N.J. 481 (1962), that the defense at a pre-Mapp trial should not on a direct appeal be charged with the failure to anticipate such a decision and its effect upon the admissibility of evidence, we held the defendant had timely raised a constitutional question and that his trial record should be reviewed in light of the aforesaid decision of the United States Supreme Court. We were unwilling, however, (1) to presume that the police officers acted without probable cause, illegally entered defendant's premises and consummated an unlawful search and seizure, or (2) to foreclose the State from an opportunity to establish the propriety of any such entrance, the necessitous circumstances if such were the case, and the reasonableness of the protested search and seizure.
Accordingly, the case was remanded to the trial court to permit the State and the defendant to enlarge the record with additional, relevant and clarifying evidence pertinent to those issues. In the interim, the appeal was retained by this court, under mandate that the entire record upon completion of the supplementary proceedings should be returned to us with the trial court's findings as to the validity of any search and seizure that produced evidence upon which defendant's conviction was predicated. State v. Evans, supra, 75 N.J. Super., at p. 327.
The trial court, on October 8, 1962, received the further proofs of the defendant, and of officers Carter M. Saunders and Robert P. Gingrich on behalf of the prosecution. The original record and a transcript of the later hearing, including the trial judge's opinion and determination that "I find as a fact that there was no reasonable cause here for search and seizure," are now before us for review.

*440 I.
While there are some minor discrepancies in the testimony of the police officials as to the precise details which preceded the search of premises 18 Rutgers Street and the subsequent arrest of Evans, the significant facts are manifest. We briefly narrate the crucial events that transpired.
An anonymous telephone message or "tip" was received at the narcotics office, Newark Police Headquarters, about 10 A.M. on July 27, 1959. Saunders said that the call related to "drugs being dealt out of an address on Rutgers Street. * * * I believe it was 53 Rutgers Street," and that the unknown communicant stated "Walter Evans was a party who was doing this dealing." Evans was described "as being 5, 5-6, something like that; wearing glasses, with a certain look, a smooth look." On two prior occasions during the preceding week, other anonymous phone calls had been received concerning "narcotics being sold from Rutgers Street," but no names or specific addresses had been previously mentioned. Within five or ten minutes after reception of the call on July 27, Saunders and his "partner, Detective Gingrich," drove "in a cab" to Rutgers Street and West Market Street, and for approximately an hour kept the area under surveillance, during which time nothing suspicious or irregular occurred.
Saunders then proceeded to a public telephone booth at the corner, and there ascertained that "W. Evans" was listed in the directory under the address of 18 Rutgers Street. He telephoned the number for that listing and asked the woman who answered the phone for Walter. A male voice answered. Saunders told him that he "needed a fix" and the voice replied, "`Well, I will have to read you first,' or words to that effect. `I will have to know who you are. So you meet me at West Market Street and Norfolk Street, and then I will see what I can do.'" Arrangements were made for a rendezvous "in about 20 minutes." Gingrich withdrew to a drugstore at the southwest corner of the suggested intersection, where he could observe activities through the store windows. Saunders *441 remained on the outside and at the appointed time perceived "Evans" walking toward him from the direction of Rutgers Street. He assumed the individual to be "Evans," stating under cross-examination:
"I didn't actually associate the identification from the description, but from the phone call and the time lapsing after the phone call and a person showing, a person showing up at the given corner, and that being the only person on the corner, that is why I came to the conclusion that this was the man."
The suspect passed Saunders, looked at him, turned away and continued walking. The officer then overtook him and asked "something about a job; if anybody wanted a job driving a truck," to which "Evans" replied, "no," and started to walk back towards Rutgers Street. Saunders, who had concluded that the defendant recognized him as an enforcement officer, reported the incident to Gingrich and they decided to pursue the accused who was then proceeding on West Market Street towards Rutgers Street. When "Evans" looked back and saw them following, he "crossed and walked in the opposite direction back down toward Norfolk Street." The officers "cut him off and asked him who he was. He identified himself." Thenceforth, according to the testimony of Saunders, Gingrich "saw a bunch of keys in his [Evans] hand, which he [Gingrich] took." Gingrich testified:
"* * * We caught him on the other side of the street and took him into a hallway. There we searched him. We told him why; that we believed that he was selling narcotics. We told him he is the one we were looking for, and we believed him to have narcotics at his home."
Parenthetically we here note the pertinent testimony of Gingrich at the main trial:
"I grabbed both his hands and steered him into a hallway there. I told him we were Newark police and I accused him of being a dealer in narcotics and of living at 18 Rutgers Street. He denied both. He had in his hand a set of keys, which I had a struggle to take from his hand at that time. * * * I told him we were taking him back to *442 18 Rutgers Street. He said he didn't live there, he had never been there and he was going to his mother's house on New Street."
At this juncture in the remand proceedings, the trial judge endeavored to ascertain if an arrest had been made and, if so, when. The ensuing interrogation produced the following explanation from the witness:
"THE COURT: Did you place him under arrest?
Q. At that point did you officially place him under arrest?
A. Technically, no. We asked him to accompany us back to Rutgers Street, but he said he didn't live there.
THE COURT: So you didn't place him under arrest?
THE WITNESS: Technically, no.
THE COURT: Well, whether it be technically or not, did you place him under arrest?
THE WITNESS: How shall I say 
THE COURT: Did you tell this man, `You are under arrest,' and tell him why?
THE WITNESS: We had nothing to actually charge him with at this time, but we told him we were holding him on suspicion. * * *
Q. Did you ever tell him he was under arrest?
A. Yes, after we found the narcotics.
Q. And that was the first time you officially told him he was under arrest?
A. That's correct. * * *
Q. It was only after you found the paraphernalia in the apartment that you placed him under arrest?
A. That's right."
Evans testified "Detective Gingrich took me under arrest on West Market Street and forced me into a hallway where he handcuffed me. And it was in this condition that he took me from West Market Street, which is more than half a block to 18 Rutgers Street, against my will." At the preceding trial he had asserted:
"* * * Detective Gingrich took me in the hallway and made me disrobe. He took my shoes, my clothes, and searched me. * * * He made me take off my shoes, my socks, and take my shirt out of my trousers, and my hat."
The search did not yield any contraband or incriminating evidence. The keys were the only items of seizure at that time.
*443 The controversial and crucial evidence admitted at the trial against Evans was obtained in the apartment at 18 Rutgers Street, to which the police gained access by the use of the keys they confiscated from the defendant.
It is not contended that Evans consented to a search of the premises. To the contrary, he denied living at that address; but the proofs plainly established otherwise. He was involuntarily taken there and upon arrival, said Detective Gingrich, "I used one of the keys on the key ring to open the door. As I did, he [Evans] called to someone inside that the police were coming in. As I opened the door I saw this woman, Terry Greco." Accordant testimony was elicited from Terry Greco:
"* * * I heard someone calling me in the hall, `Terry.' So I went to the door. Just as I was getting to the door I heard a key in the door and the door was opened and I saw a white gentleman open the door, and he came in and he told me to remain where I was or to go in the bedroom. Then they presented themselves as police officers, and that is when they began to search."
A thorough and exploratory search of the apartment disclosed the controversial evidence  heroin, marijuana and narcotic paraphernalia.

II.
An analyzation of the factual context of the litigation before us reveals:
(1) Neither a warrant for arrest, nor a search warrant had been obtained.
(2) The source of the information furnished the narcotics office on and prior to July 27, 1961 was admittedly anonymous and lacked reliable certainty. The unidentified informant made no reference to 18 Rutgers Street. A general area had been designated and the only specific address then mentioned was "I [Saunders] believe it was 53 Rutgers Street." The *444 same or similar source indicated the existence of illicit narcotic activities in the vicinity of Rutgers Street at least a week prior to the July 27 date. The surveillance of the area did not disclose any suspicious circumstances.
(3) Evans at that time was not known to the Newark police; he was characterized as a "new comer."
(4) When Saunders first accosted the defendant, after the phone call to "W. Evans" at 18 Rutgers Street, no allusion was made to narcotics; the conversation was limited to the officer's inquiry concerning a job and a laconic reply in the negative. Moreover, Evans was never identified as the same man with whom Saunders had engaged in a telephone conversation at that address.
(5) A crime had not been perpetrated in the presence of the police officers, and the proofs failed to disclose any facts indicating that a crime had been committed. When Evans was apprehended on the street and searched, no inculpatory evidence was revealed.
(6) Defendant stated that he was "handcuffed" and was taken in that condition from West Market Street, "which is more than half a block to 18 Rutgers Street, against my will." Detective Gingrich, when asked if he had handcuffed Evans, said "I don't recall."
(7) Notwithstanding defendant's deprivation of liberty and literal placement in custody, the testimony of the State's witnesses is clear that Evans had not been intentionally nor officially arrested until after the police had taken him to his apartment, made entry thereto for the obvious purpose of conducting a search, and had there found the contraband materials.
(8) The officers acted upon a suspicious conclusion that they had reasonable grounds to believe Evans was trafficking in narcotics and presumed they could obtain evidence thereof at his place of residence, which they took for granted was 18 Rutgers Street.
(9) The search of the apartment was exploratory and thorough. Saunders and Gingrich were assisted by two additional *445 personnel from the narcotics squad whom they had summoned for that purpose.
(10) Prior to the search of 18 Rutgers Street there were no facts elicited, evidence adduced or dependable information obtained that illegal drugs or paraphernalia were actually located in that particular dwelling unit. The circumstances were not emergent; the search was of permanent premises, not of a movable vehicle. No evidence was threatened by removal or destruction. Evans was not fleeing or likely to take flight; in fact, he was placed in technical custody some distance away from his apartment.

III.
Since Mapp imposes a bar upon the use by a state in a criminal proceeding of evidence seized as a result of an illegal search, the exclusionary rule is no longer one of evidence and it must now be judicially enforced as a constitutional concept. Naturally, extreme consequences have followed in the wake of that decision. See Spector, "Mapp v. Ohio: Pandora's Problems for the Prosecutor," 111 Pa. L. Rev. 4 (1962). We note the observation of Justice Jacobs in Schlemm v. Schlemm, 31 N.J. 557, 571 (1960):
"The strength of our democracy rests largely upon the constitutional guarantees which the courts enforce and the greatness of our nation is measured largely by the readiness of its people to accept and observe constitutional interpretations and applications by the designated final arbiter, the United States Supreme Court. We, as state judges, would indeed disserve the interests of our country if, because of conflicting local policies, we in any wise sought to disregard or evade the decisions of the Supreme Court as to the meaning and effect of the Federal Constitution."
As enunciated in State v. Smith, supra, the "precise contours of Mapp are as yet unclear," and we have been cautioned that "[h]ence it may be that, as to the states, the rule of exclusion will be confined to situations in which bad faith or indifference to the constitutional right is palpable." (37 N.J., *446 at pp. 490, 492). The courts of this State, a former nonexclusionary jurisdiction, have been called upon to consider numerous post-Mapp motions to suppress evidence and quash warrants. We need not cite the reported decisions. The all-important lessons which emerge from a broad consideration of those cases and the state and federal authorities that preceded them are (1) we must be ever vigilant in protecting the sanctity of constitutional rights, and (2) law enforcement officers should and can find a way of tracking down malefactors without ignoring or diluting the fundamental guarantees embedded in our democratic society.

IV.
We conclude from our study of the present record, as did the trial judge in the remand proceedings, that the search and seizure at 18 Rutgers Street were unlawful. There was a "palpable" indifference to defendant's constitutional right of privacy. The anonymous tip, the telephone conversation to that address and the subsequent suspicious circumstances generated by Evans' actions may have justified a street arrest and the eo instante search of his person; but any such probable cause, without additional evidence of a factual nature, cannot be translated into reasonable grounds for an enforced seizure of keys to his abode and an exploratory police search thereof without judicial intervention and the issuance of a search warrant. Accordingly, the evidence obtained from such illegal procedure was inadmissible. See generally Annotation, 4 L.Ed.2d 1982 (1960).
Counsel for defendant urges that the judgment of conviction be reversed and a judgment of acquittal be entered. The prosecutor does not concede the inability of the State to sustain a conviction by available proofs without recourse to the tangible evidence unlawfully seized.
The judgment of conviction is reversed, and a new trial is ordered.